JACKSON LEWIS LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960
(973) 538-6890
ATTORNEYS FOR DEFENDANT PFIZER INC.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| PATIENT CARE ASSOCIATES LLC a/s/o L.H., | : : : | Civil Action No. 2:13-cv-2065 (CCC)(JAD) |
| Plaintiff, | : : | |
| vs. | : : | **DECLARATION OF** |
| PFIZER; ABC CORP. (1-10) (Said names being fictitious and unknown entities), | : : : | **CARLA D. MACALUSO** |
| Defendant(s). | : : : | |

Carla D. Macaluso, of full age, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.    I am a Partner with the law firm of Jackson Lewis LLP, attorneys for Defendant Pfizer Inc. ("Defendant" or "Pfizer") in the within matter. I make this declaration in support of Defendant's motion to partially dismiss Plaintiff's Complaint. I am fully familiar with the facts stated herein.

2.    A true and correct copy of the Plaintiff's Complaint is attached hereto as Exhibit A.

3.    A true and correct copy of Wright v. Hartford Benefit Management Services, 2012 U.S. Dist. LEXIS 67007 (D.N.J. May 11, 2012) is attached hereto as Exhibit B.

4.    A true and correct copy of Powell, II v. Greater Media Inc. Long Term Disability Plan, 2008 U.S. Dist. LEXIS 99766 (E.D.Pa. Dec 10, 2008) is attached hereto as

1

Exhibit C.

       5.     A true and correct copy of <u>Fleisher v. Standard Ins. Co.</u>, 2011 U.S. Dist. LEXIS 46756 (D.N.J. May 2, 2011) is attached hereto as Exhibit D.

       6.     A true and correct copy of <u>Morley v. Avaya, Inc. Long Term Disability Plan</u>, 2006 U.S. Dist. LEXIS 53720 (D.N.J. Aug. 6, 2006) is attached hereto as Exhibit E.

       7.     A true and correct copy of <u>Zahl v. Cigna Corp.</u>, 2010 U.S. Dist. LEXIS 32268 (D.N.J. Mar. 31, 2010) is attached hereto as Exhibit F.

       8.     A true and correct copy of <u>Sciotto v. U.S. Healthcare Systems of Pa.</u>, 2001 U.S. Dist. LEXIS 20103 (E.D.Pa. Dec. 5, 2001) is attached hereto as Exhibit G.

       9.     A true and correct copy of <u>Temple University Hospital, Inc. v. Group Health, Inc.</u>, 2006 U.S. Dist. LEXIS 48151 (E.D. Pa. July 13, 2006) is attached hereto as Exhibit H.

       10.    A true and correct copy of <u>Montvale Surgical Center v. Horizon Blue Cross and Blue Shield of New Jersey</u>, 2013 U.S. Dist. LEXIS 15327 (D.N.J. 2013) is attached hereto as Exhibit I.

       I declare under penalty of perjury that the foregoing statements made by me are true.

                 By:    <u>s/ Carla D. Macaluso</u>
                         Carla D. Macaluso

Dated: May 23, 2013

4853-0083-6884, v. 1

# EXHIBIT A

FILED Mar 13, 2013

**MASSOOD & BRONSNICK, LLC**
50 Packanack Lake Road East
Wayne, New Jersey 07470-6663
(973) 696-1900
Attorneys for: Plaintiff

---

PATIENT CARE ASSOCIATES LLC a/s/o
L.H.,

                           Plaintiff(s),

v.

PFIZER; ABC CORP. (1-10) (Said names
being fictitious and unknown entities)

                           Defendant(s),

SUPERIOR COURT OF NEW JERSEY
BERGEN COUNTY: SPECIAL CIVIL PART

DOCKET NO: DC-005854-13

**CIVIL ACTION**

**COMPLAINT**

---

The Plaintiff, Patient Care Associates, LLC a/s/o L.H., by way of Complaint against Defendant says:

### THE PARTIES

1.    Plaintiff, Patient Care Associates, LLC (hereinafter referred to as "Patient Care" or "Plaintiff") is an ambulatory surgical center specializing in a wide array of surgical procedures and having its office located at 500 Grand Ave., Englewood, NJ 07631. At all relevant times, the Plaintiff was an "out-of-network" medical practice that provided various surgical services to subscribers enrolled in the healthcare plans of Defendant.

2.    Defendant Pfizer is a research pharmaceutical company which actively serves customers from New Jersey and is headquartered at 235 East 42nd Street New York, NY 10017.

3.    Pfizer conducts business in every county in the State of New Jersey, including

Massood & Bronsnick, LLC
Attorneys at Law

Bergen County, and venue was properly laid in Bergen County pursuant to R. 4:3-2.

4.   Pfizer maintains a self-funded health insurance plan for its employees and their participating family members.

5.   L.H. is a citizen of the United States residing in New Jersey and is a subscriber to a plan of group health insurance issued to employees and their participating family members by Pfizer.

6.   Plaintiff received a written Assignment of Benefits agreement from L.H., the aforementioned Pfizer subscriber, which transferred his contractual and legal rights under the group health policy issued by Pfizer to Plaintiff. Thus, Plaintiff has standing to bring a civil action against Pfizer. Plaintiffs make specific reference to the Assignment of Benefits as if set forth at length herein. Specifically, Plaintiffs were authorized by to file claims to the insurance carrier, file suit and enter legal actions as part of the signed Assignments of Benefits.

## SUBSTANTIVE ALLEGATIONS

7.   Pfizer operates, controls and/or administers managed healthcare insurance plans providing health and medical coverage to its members and dependents   At all relevant times, Pfizer provided certain members and/or their dependents with "out-of-network" benefits, enabling these individuals to gain access to the physicians (providers) of their choice, rather than limiting access only to "in-plan" physicians as would be true with a health maintenance organization plan.

8   Specifically, in this case, the Plaintiff provided the treating doctors and facility, a high-level ambulatory surgery center, for the medical procedures administered to

Mastood & Bronsonck, LLC
Attorneys at Law

L.H.  It is not disputed that all of the surgical procedures performed were "medically necessary" and were approved by Pfizer.

9.  The usual and customary fee, often referred to as the "reasonable and customary" fee, is defined, or is reasonably interpreted to mean, the amount that providers, like the Plaintiffs, normally charge to their patients in the free market, i.e. without an agreement with an insurance company to reduce such a charge in exchange for obtaining access to the insurance company's subscribers. Moreover, the UCR fee means the usual charge for a particular service by providers in the same geographic area with similar training and experience.

10.  In each instance, prior to Plaintiff rendering services, Pfizer agreed to directly compensate Plaintiff their UCR fee for the services provided.  Consequently, in each instance, Plaintiff reasonably believed and relied upon Pfizer's express or implied representations that Plaintiff would be paid the UCR fee and it was on that basis, Plaintiff agreed to render the services.

11.  Plaintiff submitted a bill to Defendant, Pfizer, based on the reasonable and customary charges for its services, in the amount of $12,504.00 for date of service 05/08/12.  Pfizer approved a total allowed amount of $838.66 and issued payment to Plaintiff in the amount of $670.93.  Pfizer issued an Explanation of Benefits ("EOB") indicating that L.H. was responsible for $11,833.07 and that the remaining balance of $11,833.07 was not allowed. However, the portion designated by Pfizer as "patient's responsibility" and "remaining balance" are in dispute since Plaintiff challenges the reasonable and customary charge ("UCR") allowed by Pfizer for the subject date of service.

Mascood & Bronseck, LLC
Attorneys at Law

12.   Based upon the foregoing, Plaintiff hereby demands payment in the amount of $11,833.07.

13.   Plaintiff submitted appeals for reconsideration of the claim, and for further payment.   Defendant failed to provide an appropriate response to the appeal, because they failed to provide a copy of the Summary Plan Description in a timely manner, they failed to give a detailed explanation as to how they determined the approved amount for payment on the dates of service at issue, and they failed to properly process the claims for payment. Furthermore, Defendant failed to properly advise Plaintiff about the appeal process and therefore, Defendant did not properly consider payment on appeal.

14.   Defendant has not issued any further payments to Plaintiff.

15.   By and through this lawsuit, Plaintiff now seeks damages, due to Defendant's actions that have resulted in Plaintiff not receiving payment for the significant medical services rendered.

### FIRST COUNT
### (Violation of ERISA)

16.   Plaintiff repeats and re-alleges all prior allegations as though fully set forth herein.

17.   This Count arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 et seq.

18.   L.H.'s plan, under which L.H. is entitled to health insurance coverage under ERISA, is administered and operated by Pfizer and/or Pfizer's designated third-party administrator and/or agent under ERISA

Massood & Bronwick, LLC
Attorneys at Law

19. Pfizer is the administrator and fiduciary in relation to the matters set forth herein because, *inter alia*, they exercise discretionary authority and/or discretionary control with respect to management of the plans under which Patients are entitled to benefits as assigned to Plaintiff.

20. Pfizer is a fiduciary in relation to the matters set forth herein, by virtue of its exercise of authority and/or control and/or function control respecting the management and disposition of assets of the plans and/or by exercising discretionary authority and/or discretionary responsibility and/or functional authority in the administration of L.H.'s plan.

21. Pfizer's fiduciary functions include, *inter alia*, preparation and submission of explanation of benefits, determinations as to claims for benefits and coverage decisions, oral and written communications with Plaintiff concerning benefits to Patients under the plans, and coverage, handling, management, review, decision-making and disposition of appeals and grievances under L.H.'s plan

22. Plaintiff received assignment of benefits from L.H., which had "out of network" benefits for surgery under his plan or insurance agreement with or administered by Pfizer through which he assigned to Plaintiff, *inter alia*, his right to receive payment directly from Pfizer for the services that L.H. received from Plaintiff.

23. The Assignment of Benefits that Plaintiff received from L.H. confers upon Plaintiff the status of "beneficiary" under § 502 (a) of ERISA, 29 USC § 1132(a)(1)(B) and § 1102(8) et seq.

24. As a beneficiary under § 502 (a) of ERISA, 29 USC § 1132(a)(1)(B), Plaintiff is entitled to recover benefits due (and/or other benefits due to the Patients), and to

Maraned & Brunswick, LLC
Attorneys at Law

enforce the rights of the Patients (and/or the rights of the Patients) under ERISA law and/or the terms of the applicable plans/policies.

25. Plaintiff has sought payment of benefits under L.H.'s plan and Pfizer has refused to make payment to Plaintiff at the usual, customary and reasonable rate for the medical services rendered to L.H.

26. The denial of L.H.'s claim is unsupported by substantial evidence, erroneous as a matter of law, not made in good faith, is arbitrary and capricious and is in violation of ERISA.

27. The form and basis of the denial of L.H.'s claim is insufficient and not in compliance with ERISA.

28. Plaintiff is entitled to recover the reasonable attorneys' fees and costs of action pursuant to 29 USC § 1132(g), et seq. and other provisions of ERISA, as applicable.

29. There is no basis for this claim not being fully reimbursed when the reasonable and customary charge is the standard.

WHEREFORE, Plaintiff requests judgment against Defendant for:

a) Compensatory damages;

b) Interest;

c) Costs of suit;

d) Attorney's fees; and

e) Such other relief as the Court deems equitable and just.

Mosood & Bronson, LLC
Attorneys at Law

## SECOND COUNT
### (ERISA-Breach of Fiduciary Duty)

30.     Plaintiff repeats and re-alleges all prior allegations as though fully set forth herein.

31.     Pfizer has an obligation to supply all documents used in making any claims determination.

32.     Pfizer has an obligation to explain its determination regarding the denial of claims.

33.     Pfizer has a duty to provide Plaintiff a full and fair hearing on the claims determination.

34.     Pfizer is a fiduciary under ERISA.

35.     Pfizer's determination of L.H.'s claim without any (or even substantial) explanation was arbitrary and capricious as well as being in violation of ERISA.

36.     Pfizer violated its fiduciary duty to L.H. and Plaintiff as assignee of L.H.

WHEREFORE, Plaintiff requests judgment against Defendants for:

a)  Compensatory damages;

b)  Interest;

c)  Costs of suit;

d)  Attorney's fees; and

e)  Such other relief as the Court deems equitable and just.

Maxwood & Bronstein, LLC
Attorneys at Law

## THIRD COUNT
### (Negligent Misrepresentation)

37.   Plaintiff repeats and re-alleges all prior allegations as though fully set forth herein.

38.   Despite its confirmation that payment would be issued in accordance with the reasonable and customary fees for service rendered herein, Defendant negligently refused to pay the subject claims in accordance with said confirmation.  Due to Defendant's negligent misrepresentation, Patient Care was paid less than the reasonable and customary rates.

39.   Defendant's negligent misrepresentation that payment would be issued in accordance with the reasonable and customary fees for the services rendered herein, was unknown to Patient Care at the time it agreed to perform the medical services for the subscribers and/or their dependents.  Plaintiff reasonably expected and relied upon what it believed to be Defendant's honest representations that the Plaintiff would be properly compensated in accordance with the payment confirmation.

40.   By virtue of the foregoing, Defendant has committed negligent misrepresentation.

41.   Patient Care's reliance on these misrepresentations was to its substantial detriment and as a result Plaintiff suffered significant damages

WHEREFORE, Plaintiff requests judgment against Defendant for:

a)   Compensatory damages;

b)   Interest;

c)   Costs of suit;

Massood & Bronsnick  LLC
Attorneys at Law

d) Attorney's fees; and

e) Such other relief as the Court deems equitable and just.

### FOURTH COUNT

42.  Plaintiff repeats and re-alleges all prior allegations as though fully set forth herein.

43.  On or about the aforementioned dates and place, Defendant, ABC Corporations 1 through 10, were parties responsible for the payments of Plaintiff's reasonable and customary fees.

WHEREFORE, Plaintiff requests judgment against Defendant for:

a) Compensatory damages;

b) Interest;

c) Costs of suit;

d) Attorney's fees; and

e) Such other relief as the Court deems equitable and just.

## DESIGNATION OF TRIAL COUNSEL

The undersigned hereby designates Andrew R. Bronsnick, Esq. as trial counsel for the within matter.

MASSOOD & BRONSNICK, LLC
Attorneys for Plaintiff

BY: _____
ANDREW R. BRONSNICK, ESQ.

Dated: February 27, 2013

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no other action or arbitration proceeding is contemplated. There are no other known parties who should be joined to this action.

MASSOOD & BRONSNICK, LLC
Attorneys for Plaintiff

BY: _____
ANDREW R. BRONSNICK, ESQ.

Dated: February 27, 2013

w:\wp51\majormed\patient care associates, llc\hoffman\complaint drafted 12.14.12.docx

Massood & Bronsnick, LLC
Attorneys at Law

# EXHIBIT B

2012 U.S. Dist. LEXIS 67007, *



JAMES WRIGHT, Plaintiff, v. THE HARTFORD BENEFIT MANAGEMENT
SERVICES, et al., Defendants.

Civil Case No. 11-602 (FSH) (MAH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2012 U.S. Dist. LEXIS 67007*

**May 11, 2012, Decided**
**May 11, 2012, Filed**

**NOTICE:**     NOT FOR PUBLICATION

**COUNSEL:** [*1] For JAMES WRIGHT, Plaintiff:
KEVIN T. KUTYLA, Kevin T. Kutyla, Esq., Newton,
NJ.

For THE HARTFORD BENEFIT MANAGEMENT
SERVICES, GDB CLAIMS AND SERVICES OPERA-
TIONS, Defendants: DANIEL MEIER, SEDGWICK
LLP, NEW YORK, NY.

**JUDGES:** Hon. Faith S. Hochberg, United States Dis-
trict Judge.

**OPINION BY:** Faith S. Hochberg

**OPINION**

### HOCHBERG, District Judge;

This matter comes before the Court on the parties'
Cross-Motions for Summary Judgment pursuant to *Fed.
R. Civ. P. 56* and *Local Civil Rule 56.1* and Defendants'
motion to strike portions of the affidavit filed by Plain-
tiff's counsel in support of Plaintiff's motion for summary
judgment. The Court has reviewed the parties' submis-
sions pursuant to *Fed. R. Civ. P. 78*.

### I. BACKGROUND

This case arises from Defendant The Hartford Bene-
fit Management Services' ("Hartford") decision to termi-
nate Plaintiff James Wright's ("Wright") long-term disa-
bility ("LTD") benefits under the Group Long Term
Disability Plan for the employees of JPMorgan Chase
Bank ("the Plan"), an employee welfare benefit plan
governed by the Employee Retiree Income Security Act

of 1974, *29 U.S.C. § 1001, et seq.* ("ERISA"). Wright
alleges that Hartford's decision to terminate his LTD
benefits was arbitrary and capricious and [*2] in viola-
tion of ERISA. Wright also brings claims for breach of
fiduciary duty and breach of contract.

The Plan defines "Disability or Disabled" as follows:

> 1. during the Elimination Period, you
> are prevented from performing one or
> more of the Essential Duties of Your Oc-
> cupation;
> 2. for the 24 months following the
> Elimination Period, you are prevented
> from performing one or more of the Es-
> sential Duties of Your Occupation, and as
> a result your Current Monthly Earnings
> are less than 80% of your Indexed
> Pre-disability Earnings;
> 3. after that, you are prevented from
> performing one or more the Essential Du-
> ties of Any Occupation.

Declaration of Juan M. Mendez ("Mendez Decl."), Ex-
hibit A at 21. [1] The Plan defines "Elimination Period" as
"the first 182 consecutive day(s) of any one period of
Disability." *Id.* at 6. The Plan provides that "[y]our Disa-
bility must be the result of: 1. accidental bodily injury; 2.
sickness; 3. Mental Illness; 4. Substance Abuse; or 5.
pregnancy." *Id.* at 21. "Essential Duty" is defined as "a
duty that: 1. is substantial, not incidental; 2. is funda-
mental or inherent to the occupation; and 3. can not [sic]
be reasonably omitted or changed." *Id.* "Your Occupa-
tion," which [*3] is used to determine disability during
the Elimination Period and the twenty-four months fol-
lowing, is defined as follows: "as it is recognized in the

2012 U.S. Dist. LEXIS 67007, *

general workplace. Your occupation does not mean the specific job you are performing for a specific employer at a specific location." *Id.* at 24. "Any Occupation," which is used to determine disability following the twenty-four months after the Elimination Period, is defined as "an occupation for which you are qualified by education, training or experiencing, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." *Id.* at 20.

> 1   Unless otherwise indicated, all references to page numbers are to the Bates numbered pages contained in the record as attached in Exhibits A through D to the Mendez Decl.

Wright was an employee of JPMorgan Chase ("Chase") and a participant in the Plan. Hartford both funded the Plan and administered claims for benefits under a full grant of discretionary authority. Wright was employed as an ISG Project Manager, a position which allowed him to telecommute  [*4] from home and which required him to communicate with co-workers electronically and by telephone and to travel occasionally. Wright ceased working at Chase in February 2007 and applied for short-term disability ("STD") benefits in March 2007, due to pain and other symptoms associated with a herniated disc at C6-C7, including numbness in his right arm and the inability to more his right arm above his waist. Hartford approved Wright's claim for STD benefits on March 8, 2007 and Wright received STD benefits through exhaustion of those benefits on August 21, 2007, during which time he had spine surgery (anterior cervical discectomy with fusion) and abdominal hernia repair surgery.

On December 3, 2007, Hartford approved Wright's claim for LTD benefits effective August 22, 2007 in the amount of $6,145 per month. On February 28, 2008, as part of its review of Wright's claim for continuing LTD benefits, Hartford received an Attending Physician Statement ("APS") from Wright's treating internist Dr. David A. Garrison, which stated that Wright had been diagnosed with cervical spondylosis with myelopathy, secondary to depression. On March 5, 2008, a Hartford Claims Examiner approved Wright's claim  [*5] for continuing LTD benefits, noting that Hartford should follow up on the results of diagnostic testing that Wright's neurologist recommended, including electromyography ("EMG") and a nerve conduction study ("NCS").

On May 22, 2008, during a milestone call between Wright and a Hartford Claims Examiner, Wright "answered the phone in a business manner 'Jim Wright, How

can I help you?'" after which "his speech became less clear" once he realized it was Hartford calling. Mendez Decl., Ex. B at 131. After this call, Hartford extended Wright's LTD benefits, but on June 24, 2008, referred Wright's file to Hartford's Special Investigation Unit ("SIU") for review based on the call, the fact that Wright had been discharged from physical therapy due excellent range of motion and strength, and the fact that his P.O. box was associated with a business.

On July 7 and 8, 2008, a third party, ICS Merrill, retained by Hartford's SIU conducted two days of surveillance of Wright. During this surveillance, the contractor filmed Wright shoveling and sifting dirt and spraying a hose in his yard for approximately one hour as well as driving to a local store. *See id.*, Ex. D. Following a hernia repair operation,  [*6] Hartford SIU conducted an in person interview with Wright on December 18, 2008 at his attorney's office. After the interview, during which Hartford's SIU Investigator noted that Wright "appeared to walk at a normal and with a smooth gait," Wright signed a statement documenting the interview. *Id.*, Ex. B. at 410. In the signed statement, Wright stated that he had muscle spasms from his toes to his fingers, pain throughout his body at all times, and was "limited to about 30 minutes per activity per day," including "sitting, standing, walking, driving, and other basis activities." *Id.* at 416-17.

Following the in-person interview and a review of Wright's updated medical records, on February 23, 2009, Hartford's SIU referred Wright's file to a Hartford Medical Case Manager ("MCM") for review. Wright's claim for continuing LTD benefits was approved during the MCM review. Hartford's MCM reviewed Wright's medical records, including a February 18, 2009 office visit note from physiatrist Dr. Robert H. Vrablik, which, while noting Wright's complaints of pain, stated that Wright's EMG was negative for cervical radiculopathy and that Wright "was able to ambulate into the office today generally normal,  [*7] reciprocal gait." *Id.* at 281. After her review of these records and the surveillance video, the MCM requested updated opinions from Wright's treating physicians regarding his functional capacity. Dr. Garrison responded that Wright needed to be evaluated by someone with a higher level of expertise such as a physiatrist; Dr. Dwyer responded that since his specialty is spinal surgery and not rehabilitation and disability evaluations, he recommended that Wright undergo a functional capacity evaluation ("FCE") in order to determine his level of disability; and Dr. O'Brien responded that he would not provide restrictions from a general surgery perspective. *Id.* at 109-110, 287, 392.

In response to a separate request from the MCM, Dr. Vrablik indicated on June 9, 2009 that he did not believe Wright could perform his job functions on a full time

basis, but that he should be capable of part-time work with frequent position changes. *Id.* at 389. Dr. Vrablik also stated that Wright's pain was subjective and he needed to review the results of Wright's EMG and biopsy. The record does not indicate that either an EMG or biopsy was subsequently performed.

On June 16, 2009, Hartford referred Wright's claim [*8] file to an outside contractor in order to obtain an independent medical peer review consultant to determine Wright's functional capacity. Dr. Howard Choi, board certified in physical medicine & rehabilitation, then reviewed Wright's medical records along with the surveillance footage and prepared a report in which he concluded that Wright was "capable of functioning at a medium physical demand level up to 40 hours per week." *Id.* at 372-76. Dr. Choi did recommend restrictions from heavy physical demand occupations due to Wright's multiple abdominal surgeries. However, Dr. Choi also concluded that "[t]here is no objective basis for any limitations and/or restrictions with respect to bending, sitting, standing, walking, reaching, fine motor hand activities, performing repetitive hand or foot movements, or other work-related activities on a full time basis." *Id.* at 375.

In July 2009, Hartford then had an Employability Analysis Report ("EAR") for Wright prepared based on the restrictions and capability conclusions of Dr. Choi and Wright's education and employment history. The EAR states that Wright was capable of working in the following occupations: Project Director, Operations Officer, [*9] Department Manager, Management Trainee, and General Supervisor. *Id.* at 104. [2]

> 2    According to Hartford, it reviewed Wright's claim under both the "Your Occupation" disability definition as well as the "Any Occupation" definition, which was scheduled to become operative on August 22, 2009.

Hartford then decided to terminate Wright's LTD benefits and informed him of this adverse benefit determination and provided an explanation in an August 4, 2009 letter. This letter detailed the records and evidence reviewed by Hartford's SIU, including Wright's medical records, Dr. Choi's independent medical peer review, the EAR, and the July 2008 surveillance video. Hartford explained that its decision to terminate Wright's benefits was due to the fact that "the medical, surveillance, on-site interview, and vocational evidence received does not illustrate a condition continues to prevent Mr. Wright from performing the Essential Duties of his Occupation, or alternative work as detailed above." *Id.* at 171. Hartford also explained that its "decision to terminate further benefits is not based on any single aspect of Mr. Wright's claim in and of itself, but rather is based on all available information received [*10] to date." *Id.*

On August 18, 2009, by letter, Wright administratively appealed Hartford's adverse benefit determination arguing that Hartford's determination was arbitrary and capricious because Hartford relied on "stale" medical records, failed to consider the disabling side effects of Wright's medications, improperly relied on the July 2008 surveillance video, ignored Wright's inability to drive, and relied on the opinion of a non-treating physician who did not review an FCE. *Id.* at 298-301. Hartford then transferred Wright's claim file to a Hartford Appeals Specialist, to which Wright submitted updated medical records.

In January 2010, the Appeals Specialist referred Wright's medical records to an outside contractor in order to obtain a new independent medical record review. Dr. Eric Kerstman, board certified in physical and rehabilitation medicine, then conducted a review of Wright's records, the surveillance footage, and contacted Wright's treating physicians regarding his functional capacity. On February 22, 2010, after completing his review of Wright's record, Dr. Kerstman submitted a report in which he concluded that "[b]ased on [his] review of the records provided, the surveillance [*11] video, and [his] discussions with the attending providers it is [his] opinion that [Wright] has chronic pain and is capable of sedentary work" 8 hours per day, 5 days per week with restrictions and limitations of lifting no more than 10 pounds, sitting for no more than 2 hours with the ability to change positions frequently and for no more than 8 hours total per day. *Id.* at 223. Dr. Kerstman explained that "[a]lthough [Wright's] pain symptoms were reported as 8/10, it was noted that he was having some relief from his analgesic medications" and "[t]he only documented side effects from his medications were constipation which was controlled with adjustment of analgesic dosing and laxatives." *Id.*

On February 25, 2010, Hartford informed Wright by letter that after review of his claim on appeal it had upheld its determination to terminate benefits. This letter referred to all of the records and evidence that Hartford considered and addressed the argument raised by Wright in his appeal letter. Hartford referred to the following opinions and statements by Wright's treating physicians: Dr. Garrison's opinion on September 19, 2009, after Wright's initial denial of LTD benefits, that Wright was [*12] not capable of gainful employment due to inability to use a computer or to sit for over 15 minutes at a time; Dr. Jeffers's (chiropractor) statement to Dr. Kerstman that Wright was not capable of any work due to his pain and the amount of analgesics he was taking; Dr. Garrison's statement to Dr. Kerstman that while Wright was not capable of working in any capacity, he deferred to Dr. Vrablik for specific work restrictions and limitations; and Dr. Vrablik's statement to Dr. Kerstman that he

2012 U.S. Dist. LEXIS 67007, *

could not determine Wright's work capabilities without a FCE. However, Hartford explained that "[w]hile we understand that certain restrictions and limitations are supported by the totality of the evidence, and that as a result Mr. Wright may not be able to perform certain activities or tasks, the totality of the evidence does not support that Mr. Wright would have been prevented from performing one of more of the Essential Duties of his Occupation or Any Occupation as of 8/4/2009." *Id.* at 152

## II. STANDARD OF REVIEW

Pursuant to *Fed. R. Civ. P. 56(c)*, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, **[*13]** if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988)*. All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994)*. The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson, 477 U.S. at 249*. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 860 (3d Cir. 1990)*.

The party seeking summary judgment always bears the initial burden of production. *Celotex, 477 U.S. at 323*. **[*14]** This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id. at 322-23*. This burden can be "discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id. at 325*. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, thus establishing the existence of a "genuine issue of material fact" justifying trial. *Miller, 843 F.2d at 143*; *accord Celotex, 477 U.S. at 324*.

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id. at 587* **[*15]** (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)*). Further, summary judgment may be granted if the non-moving party's "evidence is merely colorable or is not significantly probative." *Anderson, 477 U.S. at 249-50*.

## III. DISCUSSION

### A. Hartford's Termination of Benefits

Where an ERISA-governed benefit plan gives the plan administrator or fiduciary discretion in "interpret[ing] the plan and making benefits determinations," as the Plan does in this case, a court reviewing a benefits denial employs an "arbitrary and capricious" standard. [3] *Skretvedt v. E.I. Dupont De Nemours & Co., 268 F.3d 167, 173--74 (3d Cir. 2001)*. Under this standard, the reviewing court must defer to the administrator unless its decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)* (internal citations omitted). A court may overturn a plan administrator's conclusion "if it is clearly not supported by evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Id. at 41*. When evaluating claims under the substantial evidence prong, there **[*16]** are multiple factors that should be considered regarding whether a plan's decision was supported by substantial evidence in the ERISA context.

3    "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 n.2 (3d Cir. 2011)*.

In support of its motion for summary judgment and in opposition to Hartford's motion for summary judgment, Wright argues that Hartford's denial of his administrative appeal [4] was arbitrary and capricious for the following reasons: (1) Hartford failed to consider all of the medical evidence provided by Wright's treating physicians; (2) Hartford placed too much weight on the surveillance footage; (3) Hartford ignored the recommendation of Wright's treating physicians that Wright undergo an FCE; and (4) Hartford's determination was improperly influenced by a conflict of interest. Hartford contends that its decision to uphold its termination of Wright's

LTD benefits was supported by substantial evidence in the administrative record including: (1) the July 2008 surveillance footage; (2) the MCM's review of Wright's medical records; (3) Dr. Choi's independent [*17] medical review in which he concluded that Wright was capable of working full time at a medium physical demand level; (4) the EAR indicating several jobs available in the national economy of which Wright was capable of performing; and (5) a second independent medical review by Dr. Kerstman, in which he concluded that Wright was capable of performing sedentary work on a full time basis with certain restrictions.

> 4    "A plan administrator's final, post-appeal decision should be the focus of review," though "[a] court may of course consider a plan administrator's pre-final decisions as evidence of the decision-making process that yielded the final decision." *Funk v. CIGNA Group Ins., 648 F.3d 182, 191 (3d Cir. 2011).*

Wright fails to demonstrate that Hartford was arbitrary and capricious in denying his claim for continuing LTD benefits. Wright's argument that Hartford failed to consider the medical evidence provided by his treating physicians is not supported by the record. Wright points to a September 18, 2009 office visit note in which Dr. Garrison wrote that Wright was not capable of gainful employment due to inability to use a computer or to sit for over 15 minutes at a time. [5] However, [*18] the record demonstrates that this note from Dr. Garrison was considered by Hartford in its review of Wright's medical records. *See* Mendez Decl., Ex. B at 150. Dr. Kerstman spoke with Dr. Garrison about this opinion on February 11, 2010, at which time Dr. Garrison indicated that, while he believed Wright was not capable of working, he would defer to Dr. Vrablik for Wright's specific work restrictions and limitations. *Id.* at 221. Dr. Kerstman then spoke with Dr. Vrablik who indicated that he could not determine Wright's work capabilities without an FCE and that he was uncertain if Wright's pain would prevent him from returning to work. *Id.* at 222. Accordingly, it is clear that Hartford and its independent medical peer reviewer considered Dr. Garrison's September 18, 2009 office visit note.

> 5    Hartford points out that just a few months earlier, on May 21, 2009, in response to Hartford's request for his opinion on Wright's functional capacity, Dr. Garrison declined to offer an opinion, explaining that it would be more appropriate for Wright to be evaluated by "someone with a higher level of expertise," for example, "[a] clinical evaluation by a physician who specializes in pain management, [*19] physiatry." Mendez Decl., Ex. B at 392.

Wright also contends that Hartford arbitrarily ignored the side effects of his medications mentioned in his medical records. Wright does not point to any objective medical evidence in the record regarding the purportedly disabling side effects of his medication, but rather focuses primarily on an affidavit of Dr. Garrison, made after Hartford's denial of Wright's administrative appeal. *See* August 26, 2011 Affidavit of Dr. David M. Garrison ("Garrison Aff."), Exhibit AG to the Affidavit of Kevin K. Kutyla in Support of Motion for Summary Judgment ("Kutyla Aff."). In this affidavit, Dr. Garrison states that his records, which were turned over to Hartford during its review of Wright's claim, list all of Wright's medications and that "[t]hose records would clearly indicate to any competent physician that Mr. Wright is not capable of gainful employment due to his chronic pain and due to the effects of the numerous medications." Garrison Aff. ¶ 12. Dr. Garrison then states both that: (1) he told someone from Hartford over the phone that "while Mr. Wright is capable of doing yard work for an hour or two, his chronic pain and the side effects of his medication [*20] prevent him from being gainfully employed," *Id.* ¶ 10; and (2) that had anyone at Hartford asked him about anything other than the surveillance footage, he would have responded that Wright is not capable of any gainful employment due to the side effects of his numerous medications. *Id.* ¶ 18.

The Court reviews Hartford's benefits determination based on the record available to the plan administrator at the time of the determination. *Kosiba v. Merck & Co., 384 F.3d 58, 69 (3d Cir. 2004).* Therefore, Dr. Garrison's opinion regarding the disabling side of effects of Wright's medications is significant only to the extent that Dr. Garrison communicated this information to Hartford during its review of Wright's claim. [6] Significantly, Wright does not point to any evidence in the medical records actually before Hartford during the administrative appeal which demonstrates that he was disabled according to the terms of the Plan due to these side effects. Hartford argues that Wright raised this argument regarding the side effects of his medication for the first time in letter administratively appealing the initial denial of LTD benefits. According to Hartford, none of the records submitted by Wright [*21] on appeal provide objective evidence of disabling side effects of his medications. *See* Mendez Decl., Ex. B at 255-92. [7] The record demonstrates that Hartford did in fact consider the side effects of Wright's medications in its review of his claim for LTD benefits. Dr. Kerstman's report indicates that he was asked to consider the "possible side effects from the medications" and that he concluded that "[t]he only documented side effects from his medications were constipation which was controlled with adjustment of analgesic dosing and laxatives." *Id.* at 223.

6   Hartford moves to strike the Garrison Affidavit along with other exhibits attached to Wright's motion for summary judgment. With respect to the affidavit, while Hartford is correct that the Court's review is generally limited to the record before Hartford at the time of its benefits determination, anything said to Hartford by Dr. Garrison would be considered part of the administrative record. *See Baker v. The Hartford Life Ins. Co., No. 08-6382, 2010 U.S. Dist. LEXIS 52724, 2010 WL 2179150, at *7 (D.N.J. May 28, 2010).* Therefore, the Garrison Affidavit will not be stricken.

Hartford seeks to strike other exhibits attached to Wright's motion for summary judgment [*22] on the grounds that some of these exhibits constitute medical records that were not submitted to Hartford during its administrative review and some were not properly authenticated. Hartford does, however, acknowledge that some of these allegedly improperly authenticated documents are already included in the administrative record filed by Hartford. It is not necessary to strike these exhibits as the Court has not considered any medical records that were not part of the record before Hartford or any documents that were not properly authenticated.

7   Hartford notes that the only mention of side effects of medication in Wright's records submitted on appeal is Dr. Vrablik's May 18, 2009 note that Wright "denies any other side effects." Mendez Decl., Ex. B at 279.

Wright's argument that Hartford's denial of his appeal was arbitrary and capricious because Hartford ignored the opinions of his treating physicians is not supported by the record. Wright does not point to any objective clinical evidence in the record in support of his claim that he was disabled under the Plan. Wright does not point to any clinical tests in his medical records demonstrating his functional limitations. As Hartford points [*23] out, the only objective test results in the record regarding Wright's functional capacity is a December 2008 EMG report of his upper and lower extremities, which was negative for cervical radiculopathy. It is within Hartford's discretion to consider the opinions of Wright's treating physicians along with the opinions of its independent medical reviewers and to credit the latter over the former. The Supreme Court has made clear that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v.*

*Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).* 8

8   Wright relies on *Stith v. Prudential Ins. Co. of Am., 356 F. Supp. 2d 431 (D.N.J. 2005)* in support of his argument that it is arbitrary and capricious for an administrator to discount a claimant's treating physicians' opinions regarding claimant's pain in favor of a medical consultant's opinion. In *Stith*, the court held that Prudential's reliance on its medical consultant was arbitrary and capricious [*24] where that consultant completely rejected the opinions of claimant's three treating physicians regarding claimant's chronic pain without explanation on the basis that pain is subjective. *Id. at 439-40*. Here, however, Dr. Kerstman acknowledged Wright's physicians' opinions regarding his pain and accounted for that pain by concluding that Wright was capable of performing sedentary work with certain physical limitations. Additionally, it is clear that Dr. Kerstman considered Wright's physicians' opinions in light of objective clinical evidence such as Wright's December 2008 EMG.

Here, Dr. Kerstman, the independent medical expert who reviewed Wright's medical records on appeal, spoke with Wright's treating physicians and considered their opinions--in which they were unwilling to state conclusively that Wright was disabled under the Plan--and came to the conclusion that Wright was able to perform sedentary work with some physical restrictions. Wright has failed to demonstrate that Hartford's decision to uphold the denial of his benefits based in part on Dr. Kerstman's report was arbitrary and capricious.

Wright's argument that Hartford improperly relied on the July surveillance footage is unavailing [*25] and does not support a finding that Hartford's denial of his LTD benefits was arbitrary and capricious. Wright argues that "a careful analysis of the surveillance footage does not unequivocally prove that the Plaintiff is no longer disabled." Pl. Mot. Br. 5. That, however, does not correctly state the legal standard, nor was the surveillance film the only evidence that Hartford relied upon. Hartford mentioned the surveillance footage in only one paragraph of its six-page letter to Wright informing him of its basis for denying his appeal. There is no indication that Hartford's consideration of the surveillance footage of Wright digging, shoveling, and moving containers of dirt at a time when he claimed to be unable to perform his sedentary occupation, as one piece of evidence among many, was improper and Wright cites no case law demonstrating that it was arbitrary and capricious.

Wright argues that Hartford acted in an arbitrary and capricious manner by failing to provide a FCE based on

the opinion of Wright's treating physicians that it would be useful in determining his functional capacity. "When challenging the determination of an ERISA plan administrator, the plaintiff bears the [*26] burden of establishing that he is disabled under the plan and entitled to continuing benefits." *Williams v. Metro. Life Ins. Co., No. 08-1478, 2010 U.S. Dist. LEXIS 23007, 2010 WL 936147, at *7 (D.N.J. Mar. 12, 2010).* The Plan clearly states that "[a]ll proof submitted must be satisfactory to [Hartford]." *Mendez Decl., Ex. A at 17.* Hartford was not obligated to conduct testing or gather evidence additional to that which was submitted by Wright. *See Stith, 356 F. Supp. 2d at 440.* Therefore, its failure to do so was not arbitrary and capricious.

Finally, the Court considers Wright's argument that Hartford's role as Plan insurer and administrator creates a structural conflict of interest that must be weighed in favor of a finding that Hartford's denial of Wright's LTD benefits was arbitrary and capricious. The Supreme Court has held that a conflict of interest arises where "a plan administrator both evaluates claims for benefits and pays benefits claims." *Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008).* "In such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'" *Id.* (quoting *Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 144 (3d Cir. 1987)).* [*27] The court considers this conflict of interest as one factor "of several different considerations" which that court takes into account. *Id. at 117.* The Supreme Court explained that this conflict of interest

> should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* (internal citation omitted).

Hartford argues that the conflict of interest should be given little to no weight because Hartford has taken the very steps mentioned in *Glenn* to wall of its claims administrators and to encourage accurate benefits determinations and Wright has failed to demonstrate any evidence showing a link between Hartford's conflict [*28] of interest and its denial benefits determination. *See Grimes v. Prudential Fin. Inc., No. 09-419, 2010 U.S. Dist. LEXIS 64530, 2010 WL 2667424, at *15 (D.N.J. Jun. 29, 2010)* ("To demonstrate that a causal connection exists, the plaintiff must point to a link between the administrator's conflict and its benefits determination."). Hartford explains, and Wright does not contest, that it has taken, *inter alia*, the following steps to reduce the effect of any conflict of interest: (1) its claims administration employees are not compensated based on the number of claims denied, but rather, are evaluated based on the accuracy of their determinations; (2) its claims department is kept wholly separate from its finance department; (3) and it maintains a separate appeals unit and employees handling appeals do not discuss claims with employees who made the initial determination on the claim. *See* Declaration of Bruce Luddy, ¶¶ 8-12.

Accordingly, while the Court considers the conflict of interest factor to weigh in favor of Wright, based on Hartford's protective measures and Wright's failure to link any conflict of interest to the benefits determination, it does not accord significant weight to this factor. [9]

> 9   Wright's reliance [*29] on *Simon v. Prudential Ins. Co. of Am., No. 10-4286, 2011 U.S. Dist. LEXIS 78989, 2011 WL 2971203 (D.N.J. Jul. 20, 2011)* is misplaced. In *Simon* the court considered the conflict of interest factor, found that it weighed in favor the plaintiff, and ultimately found that Prudential's denial of benefits was arbitrary and capricious. However, in that case, Prudential clearly ignored the recommendation of its own pain medicine expert that "a more precise assessment of the claimant's restrictions/limitations cannot be made in the absence of a forensic physical assessment," yet listed, in its appeal letter to plaintiff, that doctor's review as one of the four pieces of evidence on which it relied. *2011 U.S. Dist. LEXIS 78989, [WL] at *2-4.* Based on this, the court found that "no reasonable person could conclude that, when Prudential ignored the opinion and recommendation of its pain medicine expert, it acted solely in the interest of the beneficiary, Plaintiff." *2011 U.S. Dist. LEXIS 78989, [WL] at *5.* The reasoning of the *Simon* court does not apply here where there is no indication that Hartford ignored the clear recommendation of either of its experts or the opinions of any of the relevant doctors. Rather, the record demonstrates that both Prudential and its independent medical [*30] reviewers

2012 U.S. Dist. LEXIS 67007, *

considered the opinions of all of Wright's treating physicians and that Prudential credited the opinions of its medical reviewers in determining that Wright was no longer entitled to LTD benefits under the Plan.

**B. Preemption**

In addition to the claim discussed above, the Complaint asserts causes of action for breach of fiduciary duty [10] and breach of contract. While Hartford moves for summary judgment on these claims, Wright fails to discuss them in either his opposition brief or in his motion for summary judgment and, therefore, appears to have abandoned these claims. Regardless, these state law claims are preempted by ERISA and the breach of fiduciary duty claim, to the extent it is made under *ERISA § 502(a)(3)*, is improper.

   10  It is not clear whether this breach of fiduciary duty claim is made under state law or under *ERISA § 502(a)(3)*. Both will be discussed.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefits plan." *29 U.S.C. § 1144(a)*. "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive [*31] and is therefore pre-empted." *Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)*. Wright's breach of contract claim and his breach of fiduciary duty claim, to the extent it is brought as a state law claim, are, therefore, preempted by ERISA. *See Pane v. RCA Corp., 868 F.2d 631, 635 (3d Cir. 1989)* (holding breach of contract claim preempted);

*Schmelzle v. Unum Life Ins. Co. of Am., No. 08-734, 2008 U.S. Dist. LEXIS 63627, 2008 WL 2966688, at *3 (D.N.J. Jul. 31, 2008)* (holding breach of fiduciary duty claim preempted).

To the extent that Wright's breach of fiduciary duty claim is made under *ERISA § 502(a)(3)*, it is improper. *ERISA § 502(a)(3)* is considered a "catchall" provision which "offer[s] appropriate equitable relief for injuries caused by violations that *§ 502* does not elsewhere adequately remedy." *Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)*. Here, Wright has challenged Hartford's benefits determination and brought a claim under *ERISA § 502(a)(1)(B)* "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *29 U.S.C. § 1132(a)(1)(B)*. Therefore, he "cannot pursue the same claim [*32] based on breach of fiduciary duty under the 'safety-net' provisions of [*ERISA § 502(a)(3)*]." *Powell, II v. Greater Media Inc. Long Term Disability Plan, No. 07-726, 2008 U.S. Dist. LEXIS 99766, 2008 WL 5188789, at *3 (E.D. Pa. Dec. 10, 2008)*.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED**. In addition, Defendants' motion to strike is **DENIED**. An appropriate Order shall follow.

/s/ Faith S. Hochberg

Hon. Faith S. Hochberg, U.S.D.J.

# EXHIBIT C

**Citation # 1**
**2008 US Dist Lexis 99766**

**Ⓐ** Analysis , As of May 20 , 2013

☐ View Available Briefs and Other Documents Related to this Case

ARTHUR T. POWELL, II vs. GREATER MEDIA INC. LONG TERM DISABILITY PLAN and GREATER MEDIA INC., Defendants.

NO. 07-726

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2008 U.S. Dist. LEXIS 99766

December 10, 2008, Decided
December 10, 2008, Filed

**PRIOR HISTORY:** Powell v. Greater Media, Inc., 2008 U.S. Dist. LEXIS 63181 (E.D. Pa., Aug. 13, 2008)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee moved for reconsideration of the court's earlier decision granting summary judgment in favor of defendants, the employee's former employer and its long term disability plan.

**OVERVIEW:** The former employee entered into a severance agreement with his employer that permitted him to retain certain benefits. The former employee later filed a claim with the employer's long term disability plan, but it was rejected because he was no longer an employee. The employee then filed this action alleging that he was due benefits under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1132(a)(1)(B), because his severance agreement amended the plan. The complaint also brought a breach of fiduciary duty claim under 29 U.S.C.S. § 1132(a)(3) and an equitable estoppel claim. The court previously granted summary judgment in favor of the employer and plan because it determined that the severance agreement did not amend the plan, and even if it did, it did not support the claim for benefits. The court also ruled that the employee could not bring a "safety net" breach of fiduciary duty claim under ERISA when he sought benefits under § 1132(a)(1)(B). The employee sought reconsideration but the court found no clear errors of law or fact. To the extent that the employee sought to have the court rethink the decision it already made, that was not a ground for reconsideration.

**OUTCOME:** The court denied the former employee's motion for reconsideration.

**CORE TERMS:** reconsideration, fiduciary duty, disability, severance, equitable estoppel, entitlement, claimant, extraordinary circumstances, long-term, equitable relief, misrepresentation, coverage, error of law, disability benefits, manifest injustice, issue of material fact, safety net, vulnerable, repeated, legal standard, current employee, entitled to benefits, cause of action, leave to amend, bad faith, intervening, presently, proceeded, actively, grounded

### LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & AmendCivil Procedure >

Judgments > Relief From Judgment > Motions to Alter & Amend
HN1 The purpose of a motion for reconsideration of an order is to correct manifest errors of law or fact, or to present newly discovered evidence. A prior decision may be altered or amended only if the party seeking reconsideration establishes at least one of the following grounds: (1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly.

Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & AmendCivil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
HN2 A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made. Parties are not free to relitigate issues which the court has already decided. The motion for reconsideration should not be used as a vehicle for endless debate between the parties and the court.

Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan BenefitsPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan Benefits
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive ReliefPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive Relief
HN3 The U.S. Supreme Court has held that 29 U.S.C.S. § 1132(a)(3) authorizes lawsuits for individualized equitable relief for breach of fiduciary duty, but has cautioned that § 1132(a)(3) acts as a safety net, offering appropriate equitable relief for injuries caused by violations that § 1132 does not elsewhere adequately remedy.

Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan BenefitsPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan Benefits
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive ReliefPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive Relief
HN4 Where a plaintiff asserts a claim under 29 U.S.C.S. § 1132(a)(1)(B) for entitlement to benefits, he cannot pursue the same claim based on breach of fiduciary duty, which is a "safety net" provision.

Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan BenefitsPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Suits to Recover Plan Benefits
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive ReliefPensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Equitable Relief > Injunctive Relief
HN5 A claimant whose injury creates a cause of action under 29 U.S.C.S. § 1132(a)(1)(B) may not proceed with a claim under 29 U.S.C.S. § 1132(a)(3).

Contracts Law > Defenses > Equitable Estoppel > ElementsContracts Law > Defenses > Equitable Estoppel > Elements
HN6 Cases that discuss the vulnerability of plaintiffs with respect to establishing extraordinary circumstances for purposes of an equitable estoppel claim involve situations of repeated misrepresentations to individuals currently hospitalized for serious injury or who have died.

☐**Available Briefs and Other Documents Related to this Case:**

<u>U.S. District Court Motion(s)</u>
<u>U.S. District Court Pleading(s)</u>

**COUNSEL: [*1]** For ARTHUR T. POWELL, II, Plaintiff: MICHAEL J. SALMANSON, LEAD ATTORNEY, SALMANSON GOLDSHAW, P.C., PHILADELPHIA, PA.

For GREATER MEDIA INC. LONG TERM DISABILITY PLAN, GREATER MEDIA INC., Defendants: HOWARD R. FLAXMAN, LEAD ATTORNEY, FOX ROTHSCHILD, LLP, PHILADELPHIA, PA.

**JUDGES:** Honorable Jan E. DuBois, United States District Judge.

**OPINION BY:** Jan E. DuBois

**OPINION**

**ORDER & MEMORANDUM**

**ORDER**

**AND NOW**, this 10th day of December, 2008, upon consideration of Plaintiff's Motion for Reconsideration and Memorandum of Law in Support thereof (Document No. 14, filed September 2, 2008); and Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Reconsideration (Document No. 15, filed September 8, 2008), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that plaintiff's Motion for Reconsideration is **DENIED**.

**MEMORANDUM**

**I. INTRODUCTION**

Presently before the Court is plaintiff's Motion for Reconsideration. Because plaintiff has failed to establish any grounds for reconsideration, plaintiff's Motion for Reconsideration is denied.

**II. BACKGROUND**

The relevant facts and procedural history of this case are stated in detail in the Court's Order and Memorandum of August 13, 2008. <u>Powell v. Greater Media Inc. Long Term Disability Plan and Greater Media, Inc., No. 07-726, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719 (E.D. Pa. Aug. 13, 2008))</u>. **[*2]** Accordingly, this Memorandum sets forth only the factual and procedural background necessary to resolve the motion presently before the Court.

Plaintiff filed a Complaint on February 22, 2007 against Greater Media Inc. Long Term Disability Plan and Greater Media Inc. based on the alleged "refusal" of defendants to "honor a specifically negotiated provision in a severance agreement and release, in which Defendants agreed to treat [plaintiff] as a current employee under its [sic] Long Term Disability Plan notwithstanding the termination of his employment." (Compl. at 1.) Specifically, paragraph three of the Severance Agreement and Release provided, in relevant part, that "the Company [defendant Greater Media Inc.] agrees to act in accordance with standard Company practice for current employees if Employee files a claim under Company's long term disability policy." <u>Powell, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at *3</u>. Plaintiff signed the Severance Agreement and Release on September 29, 2005. On July 20, 2006, he filed a claim for long-term disability benefits. <u>2008 U.S. Dist. LEXIS 63181, [WL] at *4</u>. After GE Group Life Assurance Company, the issuer of Greater Media's Disability Insurance Policy, denied plaintiff's long-term disability **[*3]** claim, plaintiff filed this suit. Id.

Plaintiff's claims are set forth in a three count Complaint. In Count I, plaintiff asserts a claim for benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1) (B), against defendant Greater Media Inc. Long Term Disability Plan. Plaintiff alleges in that count that the Severance Agreement and Release amended the language of the Greater Media Inc. Long Term Disability Plan ("the Plan") and entitled plaintiff to the benefits due under the Plan to eligible employees. (Compl. PP 32-33.)

In Count II, plaintiff makes an equitable estoppel claim under ERISA, 29 U.S.C. § 1132(a)(3), against Greater Media Inc. Long Term Disability Plan and Greater Media Inc. In that count, plaintiff asks the Court to enjoin the Plan from denying plaintiff benefits on the ground that he was not actively employed at the time he filed for long-term disability benefits. (Compl. at 7.) In Count III, plaintiff asserts a claim for breach of fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(3)(B), against Greater Media Inc. Long Term Disability Plan and Greater Media Inc. Similar to the relief sought in Count II, plaintiff's breach of fiduciary duty **[*4]** claim asks the Court to enjoin the Plan from denying plaintiff long-term disability benefits on the ground that he was not actively employed at the time he filed a claim for such benefits. (Compl. at 8.)

On November 11, 2007, plaintiff filed a Motion for Summary Judgment. (Pl.'s Mot. Summ. J., Doc. No. 9, filed Nov. 11, 2007.) On November 28, 2007, defendants Greater Media Inc. Long Term Disability Plan and Greater Media Inc. filed a Cross Motion for Summary Judgment. (Defs.' Cross Mot. Summ J., Doc No. 11, filed Nov. 28, 2007.) In its Order and Memorandum of August 13, 2008, the Court denied plaintiff's Motion for Summary Judgment, granted defendants' Cross Motion for Summary Judgment, and entered judgment in favor of defendants and against plaintiff. The bases for the Court's rulings are discussed in Part IV *infra*.

### III. LEGAL STANDARD

*HN1*☐The purpose of a motion for reconsideration of an order is to correct manifest errors of law or fact, or to present newly discovered evidence. Max's Seafood Cafe v. Max Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). A prior decision may be altered or amended only if the party seeking reconsideration establishes at least one of the following grounds: (1) **[*5]** an intervening change in controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. Id. "Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." Continental Casualty Co. v. Diversified Indus., Inc., 884 F. Supp. 937, 943 (E.D. Pa. 1995); see also Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1107 (E.D. Pa. 1992).

Moreover, *HN2*☐a "motion for reconsideration is not properly grounded on a request that a court rethink a decision already made." Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993); see also United States v. Jasin, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003) ("Parties are not free to relitigate issues which the court has already decided."). "The motion for reconsideration should not be used as a vehicle for endless debate between the parties and the court." Karr v. Castle, 768 F. Supp. 1087, 1093 (D. Del. 1991).

### IV. DISCUSSION

Plaintiff seeks reconsideration of the Court's Order and Memorandum of August 13, 2008 on the following grounds: **[*6]** (1) the Court erred in holding that plaintiff could not simultaneously bring a breach of fiduciary duty claim under ERISA, 29 U.S.C. § 1132(a)(3), and an entitlement claim under ERISA, 29 U.S.C. § 1132(a)(1)(B), in the same suit; (2) the Court should not have dismissed plaintiff's equitable estoppel claim under ERISA; and (3) the Court inappropriately drew inferences in favor of defendants.

Plaintiff's arguments for reconsideration implicate the third prong of the legal standard by which

motions for reconsideration are granted: the need to correct a clear error of law or fact or to prevent manifest injustice. Plaintiff's claims are not analyzed under the first two prongs of this legal standard because plaintiff does not argue that there has been an intervening change in controlling law or that new evidence that was not available when the court issued its order has become available.

Upon consideration of plaintiff's arguments, the Court concludes that plaintiff has failed to establish a ground for reconsideration and thus denies his motion. The Court addresses each of plaintiff's arguments below.

## A. Count III: Dismissal of Breach of Fiduciary Duty Claim

In its Order and Memorandum of August **[*7]** 13, 2008, the Court granted defendants' Cross Motion for Summary Judgment, ruling against plaintiff as to both his § 1132(a)(1)(B) entitlement claim (Count I) and his § 1132(a)(3) breach of fiduciary duty claim (Count III). Plaintiff's entitlement claim failed because the Court held that the Severance Agreement and Release did not constitute an amendment to the Plan, thus precluding plaintiff from establishing a claim for benefits under ERISA based on the language of the Severance Agreement. Powell, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at * 8. The Court further ruled that even if the Severance Agreement were considered an amendment to the Plan, the language of the Severance Agreement was not ambiguous and did not support plaintiff's claim for benefits. Id.

As to plaintiff's breach of fiduciary duty claim, the Court stated in its Order and Memorandum of August 13, 2008 that it "has previously held that a plaintiff who asserts a claim for benefits under 29 U.S.C. §1132(a)(1)(B) [for entitlement to benefits] cannot pursue the same claim based on breach of fiduciary duty under the 'safety-net' provisions of 29 U.S.C. § 1132(a)(3)." Powell v. Greater Media Inc. Long Term Disability Plan, No. 07-726, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at *9 (E.D. Pa. Aug. 13, 2008) **[*8]** (citing Johnston v. Exelon Corp., No. 04-4040, 2005 U.S. Dist. LEXIS 4723, 2005 WL 696896, at *5 (E.D. Pa. Mar. 23, 2005) (citing Varity v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996))). The Court concluded that "[b]ecause plaintiff seeks effectively the same relief in Counts I and III, namely an order requiring the Plan to treat plaintiff as an Active Full-Time Employee and to reconsider plaintiff's claim for benefits under the Plan, . . . plaintiff cannot pursue relief under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3)(B)." Powell, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at *9 (citation omitted). The Court thus granted defendants' Cross Motion for Summary Judgment as to Count III of the Complaint.

In the instant motion, plaintiff argues that the Court erred in dismissing his § 1132(a)(3) breach of fiduciary duty claim because applicable law permits claimants under ERISA to bring claims simultaneously under § 1132(a)(1)(B) and § 1132(a)(3). "While the Court is absolutely correct that a claimant cannot dress an ordinary claim for benefits under [§] 1132(a)(1)(B) into a fiduciary duty claim based on the same factual circumstances underlying the benefit claim, the Court mistakenly applied the principle to the specific allegations **[*9]** in this case." (Pl.'s Mot. Recons. 3, Doc. No. 14, filed Sept. 2, 2008.)

In support of his position, plaintiff argues that the Supreme Court's decision in Varity v. Howe, 516 U.S. 489, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996), does not prevent a plaintiff from pleading that he is either entitled to benefits or "was misled into believing that he would be entitled to benefits." (Pl.'s Mot. Recons. 3.) However, Varity does not stand for this proposition. In Varity, [HN3] the Supreme Court held that § 1132(a)(3) authorizes lawsuits for individualized equitable relief for breach of fiduciary duty, but cautioned that § 1132(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." Varity, 516 U.S. at 512. "Where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief . . . ." Id. at 515.

The plaintiffs in Varity proceeded under § 1132(a)(3) for breach of fiduciary duty because relief

under § 1132(a)(1)(B) was unavailable as they were no longer members of the applicable benefits plan in that case. Unlike in Varity, in this case <sup>HN4</sup> plaintiff asserts a claim under § 1132(a)(1)(B) **[\*10]** for entitlement to benefits. Thus, he cannot pursue the same claim based on breach of fiduciary duty, which is a "safety net" provision. Johnston v. Exelon Corp., No. 04-4040, 2005 U.S. Dist. LEXIS 4723, 2005 WL 696896, at \*5 (E.D. Pa. Mar. 23, 2005).

Moreover, plaintiff relies on Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76 (2d Cir. 2001), a non-binding Second Circuit decision, to support its contention that Varity does not preclude a plaintiff from seeking relief under both § 1132(a)(1)(B) and § 1132(a)(3). Devlin, 89-90 ("Varity did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available; instead, the district court's remedy is limited to such equitable relief as is considered appropriate."). However, as defendants correctly point out, Devlin represents the minority view on whether § 1132(a)(1)(B) and § 1132(a)(3) claims can be brought simultaneously. (Defs.' Mem. Opp'n Pl.'s Mot. Recons. 2-3, Doc. No. 15, filed Sept. 8, 2008.) In its Order and Memorandum of August 13, 2008, this Court chose to follow the Fourth Circuit in Korotynska v. Metropolitan Life Insurance Company, 474 F.3d 101 (4th Cir. 2006), and the "great majority of circuit courts **[\*11]** that have interpreted Varity to hold that <sup>HN5</sup> a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)." Korotynska, 474 F.3d at 106; see also Johnston v. Exelon Corp., No. 04-4040, 2005 U.S. Dist. LEXIS 4723, 2005 WL 696896, at \*5 (E.D. Pa. Mar. 23, 2005) (this Court's earlier decision holding that a plaintiff who asserts a claim for benefits under § 1132(a)(1)(B) cannot pursue the same claim based on § 1132(a)(3) for breach of fiduciary duty).

Finally, plaintiff argues that in Burstein et al. v. Retirement Account Plan for Employees of Allegheny Education and Research Foundation, 334 F.3d 365 (3d Cir. 2003), the Third Circuit "has specifically allowed plaintiffs to proceed on both section 1132(a)(1)(B) claims and 1132(a)(3) claims simultaneously." (Pl.'s Mot. Recons. 3.) However, the Burstein court did not address this substantive issue--namely, whether a plaintiff can bring a claim under ERISA's "safety net" § 1132 (a)(3) provision when plaintiff has a remedy available under § 1132(a)(1)(B). Rather, the Third Circuit reviewed the district court's decision on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Burstein, 334 F.3d at 368. **[\*12]** Addressing the sufficiency of the pleadings, the Burstein court concluded that plaintiffs had pled sufficient facts to state a claim for relief under § 1132(a)(1)(B) for entitlement to benefits and granted plaintiffs leave to amend their complaint to allege all elements of a § 1132(a)(3) claim for breach of fiduciary duty. [1] While plaintiffs rely on Burstein for the proposition that the Third Circuit preserves a breach of fiduciary duty claim where another potential remedy is available, Burstein does not so hold. Accordingly, the Court rejects plaintiff's argument on this issue.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

1 Specifically, the Court ruled that plaintiffs had successfully stated a claim for benefits under § 1132(a)(1)(B) after holding that a claimant can recover for benefits due under a *summary* plan description, even where the language of the summary conflicted with the language of the plan. Burstein, 334 F.3d at 378, 382. As to the breach of fiduciary duty claim, the court stated that since plaintiffs failed to plead the fourth element of such a claim--"detrimental reliance" on the fiduciary's material misrepresentation--the court provided plaintiffs with leave to amend the complaint for a third and final time in **[\*13]** order to so plead. Burstein, 334 F.3d at 378, 389.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## B. Count II: Dismissal of Equitable Estoppel Claim

In its Order and Memorandum of August 13, 2008, the Court dismissed plaintiff's equitable estoppel claim under ERISA. The Court reasoned that the equitable estoppel claim seeks relief identical to that sought in plaintiff's breach of fiduciary duty claim. Powell v. Greater Media Inc. Long Term Disability Plan, No. 07-726, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at \*10

(E.D. Pa. Aug. 13, 2008). The Court held that "this claim likewise cannot be pursued with the claim for benefits" under Varity and this Court's 2005 decision in Johnston v. Exelon Corp., 2005 U.S. Dist. LEXIS 4723, 2005 WL 696896, at *10." Id.

In the instant motion, plaintiff states: "[f]or the same reasons the Court should have proceeded on plaintiff's breach of fiduciary duty claim, a determination on the merits of his equitable estoppel claim was appropriate." (Pl.'s Mot. Recons. 4.) No authority is cited for this proposition. The Court rejects this argument for the reasons discussed in Part IV.A., *supra*, with respect to plaintiff's breach of fiduciary duty claim.

In its Order and Memorandum of August 13, 2008, the Court stated that even if it were to consider plaintiff's [*14] equitable estoppel argument on the merits, plaintiff's claim would be dismissed for failure to produce evidence of "extraordinary circumstances" that are a required element in equitable estoppel claims. Powell, 2008 U.S. Dist. LEXIS 63181, 2008 WL 3874719, at *10. "Extraordinary circumstances," the Court noted, are generally established by the employer's acts of bad faith, active concealment of significant changes in the plan, or fraud. Id. In this case, defendants' communications with plaintiff fell "far short of establishing a genuine issue of material fact as to plaintiff's allegations of fraud and bad faith." Id.

In the instant motion, plaintiff argues that the Court took "too narrow a view" of the "extraordinary circumstances" requirement. Plaintiff points to the Third Circuit's decision in Pell v. E.I. DuPont de Nemours & Company Inc., 539 F.3d 292 (3d Cir. 2008), and argues that the Pell court made clear that "extraordinary circumstances" can arise "in a variety of factual scenarios . . . where there are 'affirmative acts of fraud,' where there is a 'network of misrepresentations . . . ,' or where particular plaintiffs are especially vulnerable." Pell, 539 F.3d at 303-04. Plaintiff states that he falls under [*15] the category of "especially vulnerable" claimants because he had just been terminated from long-term employment, faced "an immediate lack of foreseeable income" if he rejected the severance package, and suffered from "an illness of uncertain origin, duration or seriousness." (Pl.'s Mot. Recons. 5.)

However, the Pell court found "extraordinary circumstances" based on the employer's "repeated misrepresentations over an extended course of dealing" and the employee's diligence in inquiring into the employer's representations and seeking clarifications. Pell, 539 F.3d at 303-04. Pell does not discuss what factors make a claimant "especially vulnerable." [HN6] Cases that discuss the vulnerability of plaintiffs involve situations of repeated misrepresentations to individuals currently hospitalized for serious injury or who have died. See Smith v. Hartford Ins. Group, 6 F.3d 131, 142 (3d Cir. 1993) (hospital patient denied coverage for a substantial claim after employer represented that coverage would exist); Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 238 (3d Cir. 1994) (widower denied supplemental dismemberment coverage upon husband's death in car accident despite repeated affirmations [*16] of eligibility for coverage by decedent's employer and insurer).

In its August 13, 2008 Order and Memorandum, this Court found no "extraordinary circumstances" in this case. Plaintiff has not demonstrated the need to correct a clear error of law or fact or to prevent manifest injustice. For these reasons, plaintiff fails to establish a ground for reconsideration on this issue.

## C. Inferences in Favor of Defendants

In its Motion for Reconsideration, plaintiff states that "it appears that the Court drew certain inferences in favor of defendants from the evidence presented, which should have resulted in the Court holding an evidentiary hearing on those issues . . . ." (Id. at 6.) Plaintiff claims this is especially true in light of the Court's September 7, 2007 Scheduling Order, which stated that the Court shall "notify the parties of any [] issues of material fact and give the parties an opportunity to supplement the record with documents or testimony with respect to each such issue." (Id. at 2.)

Beyond the above statement, plaintiff neither states what inferences were drawn in defendants' favor nor what issues of material fact the Court addressed without providing the parties an opportunity **[*17]** to supplement the record. As defendants put it, "[p]laintiff's argument is just an assertion that he disagrees with the Court's decision." (Defs.' Mem. Opp'n Pl.'s Mot. Recons. 5.) Because motions for reconsideration are not properly grounded on a request that the Court rethink decisions it has already made, plaintiff fails to establish a ground for reconsideration on this issue.

## V. CONCLUSION

Plaintiff has failed to establish a ground for reconsideration. Accordingly, the Court denies plaintiff's Motion for Reconsideration.

**BY THE COURT**:

/s/ **Honorable Jan E. DuBois**

**JAN E. DUBOIS, J.**

# EXHIBIT D

<u>Citation # 2</u>
<u>**2011 US Dist Lexis 46756**</u>

⚠ Caution , As of May 20 , 2013

☐ <u>View Available Briefs and Other Documents Related to this Case</u>

ROBERT FLEISHER, D.M.D., Plaintiff, v. STANDARD INSURANCE COMPANY, Defendant.

Civil No. 10-2678 (RBK/KMW)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2011 U.S. Dist. LEXIS 46756

May 2, 2011, Decided
May 2, 2011, Filed

**NOTICE:** NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Affirmed by <u>Fleisher v. Std. Ins. Co., 2012 U.S. App. LEXIS 9907 (3d Cir. N.J., May 17, 2012)</u>

**CORE TERMS:** administrator, insurance coverage, franchise, group insurance, standard of review, disability, arbitrary and capricious, certificate, plan administrator, conflict of interest, insurer, insurance policy, group policy, ambiguous, coverage, factual determinations, breach of contract, breach of fiduciary duty, eligibility, fiduciary, benefit plans, beneficiary, deferential, deductible, insured, holder, policy issued, failure to state a claim, equitable relief, putative
☐**Available Briefs and Other Documents Related to this Case:**

<u>U.S. District Court Motion(s)</u>
<u>U.S. District Court Pleading(s)</u>

**COUNSEL:** For ROBERT FLEISHER, D.M.D, Plaintiff: KENNETH J. GRUNFELD, RUBEN HONIK, GOLOMB & HONIK, P.C., PHILADELPHIA, PA; CLIFFORD DAVID SWIFT, III, LAW OFFICES OF MARK F. SELTZER & ASSOCIATES PC, PHILADELPHIA, PA.

For STANDARD INSURANCE COMPANY, Defendant: PETER J. GUFFIN, LEAD ATTORNEY, PIERCE ATWOOD LLP, PORTLAND, ME.

**JUDGES:** [*1] ROBERT B. KUGLER, United States District Judge.

**OPINION BY:** ROBERT B. KUGLER

**OPINION**

(Doc. No. 26)

**KUGLER**, United States District Judge:

This is a disability insurance coverage dispute stemming from an ERISA-governed insurance policy issued by Defendant Standard Insurance Company ("Standard"). Before the Court is Standard's motion to dismiss under <u>Rule 12(b)(6)</u>. Plaintiff alleges that Standard improperly reduced his disability benefits by subtracting benefits he received under a separate policy issued by North

American Company for Life and Health Insurance ("North American"). Standard claims that the deduction was proper because the Standard policy expressly provides for the subtraction of benefits received under "other group insurance coverage," and the North American policy qualifies as "group insurance." Plaintiff responds that the North American policy is most appropriately characterized as "individual insurance." Plaintiff asserts individual and class claims for wrongful denial of benefits under ERISA. Plaintiff defines the putative class to include other Standard beneficiaries whose benefits Standard reduced by amounts they received under other policies. Because the North American policy bears the characteristics **[*2]** of a kind of collective insurance called "franchise insurance," and because the phrase "group insurance coverage" can reasonably include franchise insurance, the Court finds no basis to disturb Standard's interpretation or application of the Standard policy. The Court grants Standard's motion to dismiss.

## I. BACKGROUND

## A. Factual Background[1]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

1 The facts in this section are taken from Plaintiff's Second Amended Complaint and the attached exhibits. As discussed below, although Plaintiff filed the Second Amended Complaint without obtaining leave of the Court pursuant to Federal Rule of Civil Procedure 15, the Court finds that the Second Amended Complaint is properly dismissed on the merits under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiff is a dentist. While practicing dentistry, Plaintiff obtained long term disability coverage under both the Standard policy and the North American policy. In 2008, Plaintiff became totally disabled and claimed coverage under both policies. Plaintiff's claims stem from Standard's determination that Plaintiff's benefits under the Standard policy should be reduced by the benefits he received under the North American policy.

The **[*3]** Standard policy is a group long-term disability policy that Standard issued to Plaintiff's employer, Endodontics, Ltd., P.C. ("Endodontics"). Plaintiff was covered by the Standard policy as a plan participant because he was a member of Endodontics. According to the Standard policy, a plan participant who becomes disabled is entitled to "LTD Benefits according to the terms of the Group Policy." (Pl.'s Second Compl. Ex. 1, at 4). "LTD benefits" are equal to a percentage of the plan participant's pre-disability earnings, "reduced by Deductible Income." (Id. at 2). "Deductible Income" includes "[a]ny amount you receive or are eligible to receive because of your disability under another group insurance coverage." (Id. at 13). The policy does not define "another group insurance coverage." The policy excludes from the definition of "Deductible Income" all "benefits from any individual disability insurance policy," but it does not define "individual disability insurance policy." (Id.).

The Standard policy also provides that Standard has "full and exclusive authority to control and manage the [Standard] Policy, to administer claims, and to interpret the [Standard] Policy and resolve all questions **[*4]** arising in the administration, interpretation, and application of the [Standard] policy." (Id. at 20). In that regard, Standard's "authority includes, but is not limited to, . . . [t]he right to determine: . . . eligibility for insurance; . . . [e]ntitlement to benefits; . . . [t]he amount of benefits payable; and . . . [t]he sufficiency and the amount of information [Standard] may reasonably require to [make those determinations]." (Id.) (formatting altered).

Plaintiff obtained coverage under the North American policy "through the American Association of Endodontics" (the "AAE"). (Ex. 3, at 1). Plaintiff attaches to the Second Amended Complaint a six-page document entitled "Certificate of Insurance" issued by North American (the "Certificate"). (Second Am. Compl. Ex. 2, at 1). The Certificate provides:

> NORTH AMERICAN COMPANY. . .
>
> Having issued group policy PG A320 (herein called Policy) insuring members of the Association [the AAE] . . . .
>
> HEREBY CERTIFIES that the member to whom this Certificate is issued (herein the Insured) is insured under and subject to all the provisions, definitions, limitations and conditions of said policy . . . as to injury and sickness as defined herein, provided **[\*5]** such member is . . . on active, full-time duty . . .

(Id. at 1). The Certificate includes multiple other references to the interplay between "the policy" and "this Certificate." (See id. at 1, 5, 7). The Certificate also provides: "The policy is in possession of the Holder and may be inspected by the Insured at any time during business hours at the office of the Holder." (Id. at 8).

Plaintiff's disability entitles him to receive $10,000 a month under the Standard policy and $1,500 a month under the North American policy. However, Standard determined that Plaintiff's proceeds under the North American policy were "group insurance coverage," and therefore deductable from his "LTD Benefits" under the Standard policy. Thus, Standard pays Plaintiff only $8,500 per month in benefits under the Standard policy.

Plaintiff contested Standard's determination that the Certificate is "group insurance coverage." In support of his position, Plaintiff obtained a letter from North American stating:

> As we previously explained, please understand that that [sic] Dr. Fleisher's North American Company policy . . . was issued through the American Association of Endodontics. Even though this policy was issued **[\*6]** through this group, it is an individual disability income policy and we are treating all aspects of Dr. Fleisher's claim as an individual disability income policy.

(Second Am. Compl. Ex. 3). Plaintiff also alleges that "[a]ll insurance policies issued through professional associations are individual disability insurance policies." (Second Am. Compl. ¶ 7). Plaintiff does not cite the basis for this categorical statement. He insists, however, that "in terms of classifying policies as 'individual' in nature, all professional association disability insurance policies contain materially identical characteristics . . . [, and] the existence of these characteristics makes them inherently and uniformly 'individual' in nature." (Id. ¶¶ 9-10).

In that regard, Plaintiff claims that the North American policy is an individual rather than group policy because: (1) it was individually underwritten for Plaintiff; (2) Plaintiff paid the premiums directly; (3) Plaintiff "enrolled directly"; (4) Plaintiff submits claims directly to North American; (5) North American issues Plaintiff individual billing statements; and (6) the policy automatically renews at the end of each term. (Id.). According to Plaintiff, **[\*7]** those features establish that the North American policy is not "group coverage" within the meaning of the Standard policy, and, therefore, Standard is not authorized to deduct benefits under the North American policy from benefits due under the Standard policy.

## B. Procedural History

Plaintiff filed the Complaint in May 2010. The Complaint asserted claims for breach of contract, violations of the New Jersey Consumer Fraud Act, breach of fiduciary duty under ERISA, and unjust enrichment. Plaintiff asserted each claim on behalf of himself and a putative class. Plaintiff defined the putative class as including two subclasses:

a. Those Members who are currently disabled and whose benefits from The Standard are reduced by benefits from a professional association policy,

b. Those members who have not yet manifested an entitlement to benefits under their policies issued by The Standard because they are not presently disabled.

(Compl. ¶ 30). Standard did not answer the Complaint but timely moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. No. 11). Standard argued that ERISA preempts Plaintiff's state law claims for breach of contract, violations of the New Jersey Consumer **[*8]** Fraud Act, and unjust enrichment. Standard also argued that Plaintiff failed to state a claim under ERISA.

Plaintiff did not oppose Standard's motion to dismiss but made a motion to amend the Complaint, which the Court granted. The Amended Complaint included only claims for breach of fiduciary duty and breach of contract under ERISA. The Amended Complaint asserts both claims on behalf of Plaintiff and the same putative class defined in the original Complaint. Standard did not answer Plaintiff's Amended Complaint but timely moved to dismiss pursuant to Rule 12(b)(6). (Doc. No. 23). Standard argued that Plaintiff could not, as a matter of law, assert a claim for breach of fiduciary duty under ERISA § 502(a)(1)(B) or § 502(a)(3). Standard also argued that Plaintiff failed to state a claim for recovery of benefits under an ERISA-governed plan.

Plaintiff did not oppose Standard's motion to dismiss the Amended Complaint. Rather, without leave of the Court, Plaintiff purported to file a Second Amended Complaint. The Second Amended Complaint asserts claims for: (1) breach of fiduciary duty pursuant to ERISA § 502(a)(3) (Count I); (2) breach of contract pursuant to ERISA § 502(a)(1)(B) (Count **[*9]** II); and (3) breach of contract pursuant to ERISA § 502(a)(3) (Count III). Plaintiff asserts all three claims on behalf of himself and the same putative class.

Standard now moves to dismiss the Second Amended Complaint. (Doc. No. 26). Standard argues that the Second Amended Complaint should be dismissed because Plaintiff violated Rule 15 by filing it without first obtaining leave from the Court. Standard also argues that the Second Amended Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. Standard argues that Counts I and III of the Second Amended Complaint fail because a plaintiff may bring a claim under ERISA § 502(a)(3) only if the requested relief is unavailable under any other ERISA provision. Standard argues that Count II should be dismissed because Plaintiff's allegations, even if accepted as true, do not establish that Standard's reduction of Plaintiff's benefits was arbitrary or capricious.

Plaintiff opposes Standard's motion to dismiss the Second Amended Complaint. He argues that Rule 15's standard for amendment is satisfied. He also argues that he may plead claims under ERISA § 502(a)(3) and § 502(a)(1)(B) in the alternative and that his factual **[*10]** allegations establish that Standard arbitrarily denied him benefits. Plaintiff further claims that the Court must review Standard's reduction of benefits de novo because that decision was based on Standard's interpretation of the North American policy, which is a nonplan document.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted. With a motion to dismiss, "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In addition to the allegations of the complaint, a court may consider matters of

public record, documents specifically referenced in or attached **[*11]** to the complaint, and documents integral to the allegations raised in the complaint. Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 255 n. 5 (3d Cir. 2004).

In making that determination, a court must conduct a two-part analysis. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009); Fowler, 578 F.3d at 210-11. First, the court must separate factual allegations from legal conclusions. Iqbal, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, the court must determine whether the factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." Id. at 1950. Determining plausibility is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." Id. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. See id.

## III. DISCUSSION

### A. Plaintiff's ERISA Claim under § 502(a)(1)(B)

Count II of the Second Amended Complaint asserts a claim for "breach of contract" under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Plaintiff alleges that Standard "breached its obligations **[*12]** under ERISA to [Plaintiff] and all Members of the Class by taking a deduction to which it was not entitled and thus unreasonably failing to pay those benefits in full to them." (Second Am. Compl. ¶ 66).

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, 463 U.S. 85, 90, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983). "An 'employee welfare benefit plan' includes any program that provides benefits for contingencies such as illness, accident, disability, death, or unemployment." Id. at 91 n.5 (citing 29 U.S.C. § 1002(1)). ERISA does not mandate that employers provide any particular benefits, but it "sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for" employee benefit plans. Id. at 91 (citing 29 U.S.C. §§ 1021-31, 1101-14).

In order to facilitate those objectives, § 502(a)(1)(B) creates a civil cause of action for a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A claim under § 502(a)(1)(B) **[*13]** generally involves a suit by a plan beneficiary against the plan administrator for failure to properly administer the plan. See, e.g., Zebrowski v. Evonik Degussa Corp. Admin. Comm., No. 10-542, 2011 U.S. Dist. LEXIS 18596 (E.D. Pa. Feb. 23, 2011). To assert a claim under § 502(a)(1)(B), a plaintiff must demonstrate that "he or she [has] a right to benefits that is legally enforceable against the plan" and that the plan administrator improperly denied him or her those benefits. Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574 (3d Cir. 2006).

The parties do not dispute that the Standard policy is an "employee welfare benefit plan" governed by ERISA. See 29 U. S. C. § 1002(1) (defining "employee welfare benefit plan"). Rather, they dispute whether the Standard policy permits Standard to reduce Plaintiff's benefits by amounts he receives under the North American policy. The parties dispute both the proper standard to be applied in reviewing Standard's reduction of benefits, as well as the outcome under the appropriate standard.

### 1. Standard of Review

Plaintiff argues that a plan administrator is entitled to the deferential "arbitrary and capricious" standard of review only if the administrator **[*14]** is interpreting documents that are part of the governing plan. (Pl.'s Br. in Opp. to Def.'s M. to Dismiss, at 11). According to Plaintiff, "if the

administrator is interpreting documents that are not part of the coverage plan, a de novo review applies." (Id. at 11). Plaintiff claims that in this case de novo review applies because Standard's denial of benefits was based on its interpretation of the North American policy, which is a nonplan document. Standard responds that if a plan grants the administrator discretion to both interpret the underlying plan and make factual determinations regarding administration of benefits, then the arbitrary-and-capricious standard of review applies to an administrator's findings regarding documents that are not part of the underlying plan.

"In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court held that, when analyzing a challenge to a denial of benefits in these actions, a court must review the plan administrator's decision under a de novo standard of review unless the plan grants discretionary authority to the administrator to determine eligibility for benefits or interpret terms under the plan." Saltzman v. Independence Blue Cross, 384 F. App'x. 107, 111 (3d Cir. 2010)  [*15] (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). Thus, the Third Circuit has held that the appropriate standard of review depends on the discretion granted to the administrator under the terms of the ERISA-governed plan. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 438 (3d Cir. 1997), abrogated on other grounds as stated in Miller v. Am. Airlines, Inc., No. 10-1784, 632 F.3d 837, 2011 U.S. App. LEXIS 1462, at *19-20 (3d Cir. Jan. 25, 2011) (citing Firestone, 489 U.S. at 109). If the plan grants the administrator discretion "to construe the terms of the plan," the court "applies an arbitrary and capricious standard of review" regarding interpretation of the plan. Saltzman, 384 F. App'x. at 111 (citing Gritzer v. CBS, Inc., 275 F.3d 291, 295 (3d Cir. 2002)). Similarly, if the plan grants the administrator "the discretion to act as a finder of facts," then the court will also apply the arbitrary and capricious standard of review to factual determinations. Mitchell, 113 F.3d at 438; see Anderson v. Bakery & Confectionery Union & Indus. Int'l Pension Fund, 654 F. Supp. 2d 267, 279 (E.D. Pa. 2009) (finding that factual determinations were subject to arbitrary and capricious standard  [*16] of review).

In Mitchell, the plan vested the administrator with the following authority: "In reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan." Id. The Third Circuit held that, "giving this language its ordinary meaning, we conclude that the broad grant of discretionary authority to the Administrator is sufficient to preclude de novo review of both interpretative and factual determinations made in the course of applying the benefit provisions of the Plan to a particular application for benefits." Id. The Third Circuit reasoned that granting the administrator the authority to "apply" the plan, gave the administrator the authority to resolve factual disputes necessary to determine benefit eligibility under the plan. Id. at 439 ("'application' of the Plan, like 'application' of the law, must encompass the resolution of factual disputes as well as the interpretation of the governing provisions of the plan."). Thus, the Third Circuit applied the deferential abuse-of-discretion standard [2] to the plan administrator's interpretation of the  [*17] plan's terms as well as the administrator's use and interpretation of nonplan documents. Id. at 440-43; Anderson, 654 F. Supp. 2d at 279 ("the Mitchell court reviewed the administrator's decision to deny the plaintiff benefits — a decision the administrator had reached on a record of evidence containing medical (non-plan) documentation — under the deferential arbitrary and capricious standard.").

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

2 According to the Third Circuit: "Our prior caselaw referenced an 'arbitrary and capricious' standard of review, while [the Supreme Court in Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)], describes the standard as 'abuse of discretion.' We have recognized that, at least in the ERISA context, these standards of review are practically identical." Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 526 n.2 (3d Cir. 2009) (citing Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir.1993)).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -



Like the plan at issue in Mitchell, the Standard policy gives the administrator discretionary authority over the policy's "application." Indeed, the Standard policy vests the administrator with the "full and exclusive authority" to "interpret the [Standard] Policy and resolve all questions arising **[*18]** in the administration, interpretation, and application of the [Standard] Policy." (Second Am. Compl. Ex. 1, at 20) (emphasis added). Thus, as in Mitchell, the Standard policy gives Standard the authority to interpret the plan and make findings of fact necessary to determine benefit eligibility. See Mitchell, 113 F.3d at 439; see also Anderson, 654 F. Supp. 2d at 279 (holding that plan language giving administrator the "exclusive right to administer, apply, and interpret the Plan" gave the administrator the discretion to make necessary factual determinations). The Court must therefore review Standard's benefit determination under the deferential abuse-of-discretion standard. This includes Standard's interpretation and characterization of the North American policy. See Anderson, 654 F. Supp. 2d at 279 (holding that plan administrator's interpretation of a settlement agreement for purposes of determining eligibility for pension benefits was a factual determination entitled to deference under the abuse-of-discretion standard).

## 2. Denial of Full Benefits under the Standard Policy

"Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn **[*19]** a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989)). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants [sic] in determining eligibility for plan benefits." Id.

Regarding interpretation of plan terms, an administrator's interpretation is "not arbitrary" if it is "reasonably consistent with unambiguous plan language."[3] Bill Gray Enters. v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001). Even if plan language is ambiguous, the court must defer to the administrator's interpretation unless it is arbitrary and capricious. McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan, 340 F.3d 139, 143 (3d Cir. 2003). Similarly, an administrator's factual determinations are based on "substantial evidence" if they are supported by "more than a mere scintilla." Kowalchick v. Director, OWCP, 893 F.2d 615, 619 (3d Cir. 1990). "Substantial evidence" is "such relevant evidence as a reasonable mind might **[*20]** accept as adequate to support a conclusion." Soubik v. Director, OWCP, 366 F.3d 226, 233 (3d Cir. 2004). When reviewing an administrator's factual determinations, the court looks only to the "evidence that was before the administrator when he made the decision being reviewed." Mitchell, 113 F.3d at 440.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

3 The Court notes that there is some uncertainty in the Third Circuit regarding the appropriate standard of review when the plan language is unambiguous. In Lasser v. Reliance Std. Life Ins. Co., 344 F.3d 381, 386 (3d Cir. 2003), the Third Circuit stated: "We recognize that, if the meaning of [the plan term] is ambiguous, [the administrator's] definition is entitled to deference under the applicable arbitrary and capricious standard." See Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 177 (3d. Cir. 2001) ("[the administrator's] interpretation of [the plan] is entitled to deference under the arbitrary and capricious standard, unless it is contrary to the plain language of the plan."). This language suggests that the arbitrary-and-capricious standard of review is appropriate only if the language of the plan is ambiguous. However, "the Supreme Court in Firestone mandated the 'arbitrary **[*21]** and capricious' standard of review, without reference to whether a policy term was ambiguous." Weiss v. Prudential Ins. Co. of Am., 497 F. Supp. 2d 606, 611 (D.N.J. 2007). Thus, some district courts in this Circuit have departed from Lasser and Skretvedt and applied the arbitrary and capricious standard without regard to whether the disputed term was ambiguous. See, e.g., id. at 613. Here, because the Court determines that the phrase "another group insurance coverage" is ambiguous, the arbitrary and capricious standard applies in any event.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Notwithstanding this deferential standard, the Supreme Court has held that if a plan administrator performs the dual role of determining benefit eligibility and paying benefits, a conflict of interest exists that a court must consider when reviewing determinations by plan administrators. Firestone, 489 U.S. at 115 ("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion'") (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)). [4] However, a conflict of interest is only one factor to **[*22]** consider when evaluating the lawfulness of a plan administrator's determinations. See Glenn, 554 U.S. at 117 ("Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."). In Glenn, the Supreme Court further explained that a conflict of interest may operate as a "tiebreaker" in cases where the balancing of other factors leads to a close call. Glenn, 554 U.S. at 117.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[4] In Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 115, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008), the Supreme Court clarified its holding in Firestone by explaining that a conflict of interest does not result in "a change in the standard of review." (emphasis in original). Metro Life abrogated a line of Third Circuit cases interpreting Firestone to require a "'sliding scale' standard of review where the level of conflict would influence the intensity of arbitrary and capricious review." Miller v. Am. Airlines, Inc., No. 10-1784, 632 F.3d 837, 2011 U.S. App. LEXIS 1462, at *13-14 n.3 (3d Cir. Jan. 25, 2011) (explaining Glenn's impact on Third Circuit precedent applying Firestone). The Third Circuit now applies "a **[*23]** deferential abuse of discretion standard of review across the board and consider[s] any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." Schwing, 562 F.3d at 525.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Here, the first factor to consider is the relevant language in the Standard policy. The policy excludes as deductible income all proceeds paid "under another group insurance coverage." Unfortunately, that phrase does not provide much clarity because the term "group insurance" is ambiguous. In its most general sense, the term is used "whenever a master policy was issued to a person or entity, including associations, with individual certificates then being issued to those whose lives or well-being are the subject of insurance." Holmes' Appleman on Insurance § 2.5 (2d ed. 2002) (emphasis added); see Hall v. Life Ins. Co. of N. Am., 317 F.3d 773, 775-76 (7th Cir. 2003); Couch on Insurance § 1:29 (3d ed. 2002). However, insurers have developed at least two subsets of collective insurance products: "true group insurance" and "franchise insurance." See Appleman on Insurance Law & Practice § 54 (rev. ed. 1981). "Group insurance is an arrangement by which **[*24]** a single insurance policy is issued to a central entity—commonly an employer, association, or union—for coverage of the individual members of the group. Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies." Couch on Insurance § 1:29 (3d ed. 2002).

True group insurance generally has the following characteristics: (1) "there is a close relationship between the certificate holder and the holder of the master policy — usually, but not always, that of employment;" (2) all employee or members are automatically enrolled by virtue of their employment or membership; (3) the "master policy holder" is responsible for notifying the insurer of the persons covered by the policy at any particular time; (3) the "master policy insured" is responsible to the insurer for paying premiums, whether on a contributory or noncontributory basis; and (4) the "master policy insured" is responsible for processing claims by employees or members. Appleman on Insurance Law & Practice §§ 41, 54 (rev. ed. 1981).

Franchise insurance is a kind of collective insurance where the governing entity or association "grants a franchise to the insurer to solicit its **[*25]** members, or other personnel, and places a qualified stamp of approval" on a general policy offered by the insurer to the members. Appleman on Insurance Law & Practice § 54 (rev. ed. 1981). Although "the holder of the master policy and insurer may negotiate" to modify or terminate the plan, in all other respects the relationship between members and the insurer is "precisely that of an insurer dealing directly with its policyholders." Id. ("each insured has independent rights against the insurer which are exactly the same as if there were no other contracts existing between such company and the organization or other members"); see Daniels v. Nat'l Home Life Assurance Co., 103 Nev. 674, 747 P.2d 897 (Nev. 1987) (finding that franchise insurance policy was best characterized as an individual rather than group policy for purposes of Nevada insurance statute). Thus, franchise insurance generally has the following characteristics: (1) members of the relevant association or entity may enroll in the plan but are not required to do so; (2) members pay premiums directly to the insurer; (3) members make claims directly to the insurer; and (4) insurers agree to "waive underwriting, and take all applicants across **[*26]** the board." Appleman on Insurance Law & Practice § 54 (rev. ed. 1981).

Although true group insurance and franchise insurance are distinct products, "lawyers, legal writers, publishers, and the courts" can refer to them individually and collectively as "group insurance." Holmes' Appleman on Insurance § 2.5 (2d ed. 2002) (criticizing this practice and arguing that it is inaccurate to refer to franchise insurance as group insurance); see Hall, 317 F.3d at 775-76 (noting that franchise insurance is "group insurance" in the sense that it involves the purchase of insurance coverage through a collectively negotiated plan). Thus, the phrase "group insurance," standing alone begs the question of whether the phrase refers to true group insurance, franchise insurance, or both. See Hall, 317 F.3d at 776 (holding that a policy that allowed for deduction of proceeds from "group insurance" resolved this ambiguity because it also specifically included "franchise insurance" in the list of deductibles). In other words, the term is ambiguous because it may reasonably refer to at least two different types of collective insurance products.

Thus, the Court must decide whether, in light of the term's inherent **[*27]** ambiguity, Standard's determination that the North American policy did not qualify as "group insurance" was an unreasonable interpretation. Plaintiff argues that Standard's determination was unreasonable because the North American policy bears certain features characteristic of individual insurance policies. Specifically, Plaintiff alleges that: (1) North American individually underwrote the policy for Plaintiff; (2) Plaintiff paid premiums directly to North American; (3) Plaintiff "enrolled directly"; (4) Plaintiff submits claims directly to North American; (5) North American issues Plaintiff individual billing statements; and (6) the policy automatically renews at the end of each term. Plaintiff therefore concludes that the North American policy is a pure individual policy.

However, Plaintiff does not deny that the North American policy was issued through the AAE. Indeed, the Certificate, which Plaintiff attaches to the Complaint, clearly states that it is issued pursuant and subject to "group policy PG A320," which is held by AAE, and that Plaintiff obtained the Certificate as a member of the AAE. Thus, even if all of Plaintiff's allegations are accepted as true, and even if the **[*28]** record before the administrator included all of those facts, the North American policy is reasonably characterized as a franchise policy because it was issued through a group, whose members could individually apply for coverage, and the members otherwise interacted directly with the North American regarding coverage and premiums.

This conclusion is further supported by the fact that the Standard policy explicitly exempts from deductible income any proceeds received under "any individual disability insurance policy." Even if Plaintiff's allegations are accepted as true, the North American policy is certainly not a pure individual policy because it plainly states that it is issued pursuant to a group policy held by AAE. Moreover, North American itself admits that the policy "was issued through this group [the AAE]." Thus, it was not unreasonable for Standard to conclude that the North American policy was not an "individual policy" exempt from deduction but was "group insurance coverage" subject to deduction. Cf. Gutta v. Std. Select Trust Ins. Plans, 530 F.3d 614 (7th Cir. 2008) (holding that the phrase "group insurance coverage" did not include a policy that was expressly issued pursuant

[*29] to a group policy held by a professional association notwithstanding that the policy had some attributes of individual insurance).

Plaintiff nevertheless contends that an insurance policy that bears some characteristics of an individual policy cannot reasonably be describes as "group insurance coverage." The Court disagrees. As discussed above, the phrase "group insurance," standing alone, has various possible referents. The term may be used to refer to circumstances where "a master policy was issued to a person or entity, including associations, with individual certificates then being issued to those whose lives or well-being are the subject of insurance." Holmes' Appleman on Insurance § 2.5 (2d ed. 2002) (emphasis added). If the term is used in that very general sense, it incorporates both true group insurance and franchise insurance. Id.; Hall, 317 F.3d at 775-76. Both of those referents are reasonably within the term's semantic range. Thus, even if Plaintiff's allegations are accepted as true, and the North American policy is not "true group insurance" but franchise insurance, it was not unreasonable for Standard to conclude that the unqualified phrase "group insurance coverage" [*30] included the North American policy. 5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

5 The Standard policy includes as deductible income benefits received under "another group insurance coverage." It could be argued that the word "another" qualifies the phrase "group insurance coverage" by limiting it to only those kinds of group policies that are similar to the Standard policy itself. The Court rejects this argument. Inserting the word "another" before the phrase "group insurance coverage" does not require the conclusion that "group insurance coverage" is limited to only policies that are similar to the Standard policy. Moreover, even if the word "another" has some qualifying affect, it provides no indication as to which attributes of the Standard policy are intended to be excluded from the meaning of "group insurance coverage." Thus, notwithstanding the word "another," Standard was not unreasonable in determining that the North American policy, which bears some group characteristics, was within the meaning of "group insurance coverage."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Moreover, this is not so close a case that any conflict of interest would break the tie and tip the scales in favor of Plaintiff. 6 See Schwing, 562 F.3d at 526 (denying beneficiary's challenge of [*31] administrator's determination notwithstanding a conflict of interest because "there was an abundance of evidence . . . to support the denial of his claim and a lack of evidence to support his theory of pretext); Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 582 (8th Cir. 2008) ("Taking into account the remaining factors discussed below, we conclude that there is not a sufficiently close balance for the conflict of interest to act as a tiebreaker in favor of finding that [the administrator] abused its discretion"). Plaintiff offers no support for the proposition that it is unreasonable to interpret the phrase "group insurance coverage" to include franchise insurance policies. The available authority supports the conclusion that the phrase can be can be used broadly to include franchise insurance. 7 Thus, notwithstanding a potential conflict of interest, the reasonableness of Standard's determination is not seriously in question.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

6 Plaintiff alleges facts sufficient to establish a conflict of interest. Plaintiff alleges that Defendant "marketed, sold, managed, and administered" the Standard Policy. (Second Am. Compl. ¶ 19). Plaintiff further alleges that "Standard considered [the [*32] North American Policy], and all disability insurance policies issued through professional associations, as 'group' policies so it could take the benefits received from the [North American Policy] as a set off from the benefits received from the Standard Policy, thus reducing its financial obligation to [Plaintiff] and those similarly situated, and increase its own bottom line profitability." (Second Am. Compl.¶ 45).

7 Some courts have held that, for regulatory purposes, franchise insurance is more analogous to

individual insurance than true group insurance. See Daniels, 103 Nev. 674, 747 P.2d 897, 900 (Nev. 1987) (finding that franchise insurance policy was best characterized as an individual rather than group policy for purposes of Nevada insurance statute); Wood v. New York Life Ins. Co., 255 Ga. 300, 336 S.E.2d 806 (Ga. 1985) (same regarding Georgia's insurance statute). Those cases do no undermine the Court's conclusion that the bald phrase "group insurance" can reasonably include franchise insurance.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court therefore grants Standard's motion to dismiss Plaintiff's ERISA claim under § 502(a)(1) (B) because even if Plaintiff's allegations are accepted as true, Standard's decision to deduct proceeds from the **[*33]** North American policy was not an unreasonable interpretation and application of the Standard policy.

**B. Plaintiff's ERISA Claims under § 502(a)(3)**

Plaintiff asserts claims for breach of fiduciary duty and breach of contract under ERISA § 502(a)(3) (Counts I and III respectively). Under ERISA § 502(a)(3), a participant or beneficiary of an ERISA-governed plan can sue: "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1132 (a)(3). Plaintiff's claim for breach of fiduciary duty is apparently predicated on § 404 of ERISA, "which defines fiduciary duties owed by plan administrators to their beneficiaries." Harte v. Bethlehem Steel Corp., 214 F.3d 446, 451 (3d Cir. 2000) (citing § 404 codified at 29 U.S.C. § 1104).

The sole basis for Plaintiff's claims under ERISA § 502(a)(3) is that Standard improperly deducted his North American policy benefits from proceeds due under the Standard policy. According to Plaintiff, Standard's improper deduction amounts to a breach of its fiduciary **[*34]** duties under ERISA and a breach of the terms of the Standard policy. Plaintiff does not allege that Standard engaged in any other independent misconduct amounting to a breach of its fiduciary duties or a breach of the plan's terms. However, as discussed above, Standard's determination that proceeds from the North American policy should be deducted from proceeds due under the Standard policy was not an unreasonable interpretation or application of the Standard policy. Because Standard's determination was reasonable in light of the policy's language, Plaintiff fails to state a claim for breach of fiduciary duty or breach of the Standard policy under § 502(a)(3). [8] See Zurawel, 2010 U.S. Dist. LEXIS 102085, at *60 (dismissing claim under § 502(a)(3) because court found that administrator's conduct was not improper under § 502(a)(1)(B)).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

[8] Standard also argues that Plaintiff's § 502(a)(3) claims are barred under Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996), which held that § 502(a)(3) is a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." According to Standard, Varity **[*35]** stands for the proposition that a plaintiff may not bring a § 502(a)(3) unless the plaintiff may not obtain the requested relief by asserting a claim under § 502(a)(1)(B). Plaintiff responds by citing various cases permitting plaintiffs to pursue both § 502(a)(1)(B) and § 502(a) (3) claims. See, e.g., Moore v. First Union Corp., 00-2512, 2000 U.S. Dist. LEXIS 10730, at *2 (E.D. Pa. July 24, 2000) ("As was recently noted by this Court, Varity does not propose a bright-line rule that a claim for equitable relief under § 1132(a)(3) should be dismissed when a plaintiff also brings a claim under § 1132(a)(1)(B)."); Crummett v. Metro. Life Ins. Co., No. 06-1450, 2007 U.S. Dist. LEXIS 50956, at *8 (D.D.C. July 16, 2007). Because the Court finds that Plaintiff's § 502 (a)(3) claims fail on the merits, the Court need not address this argument by Standard.

Moreover, the Court notes that the residual or "catchall" nature of § 502(a)(3) does not imply that

a plaintiff has a claim under § 502(a)(3) whenever his claim fails under § 502(a)(1)(B). See Zurawel v. Long Term Disability Income Plan for Choices Eligible Emp. of Johnson & Johnson, No. 07-5972, 2010 U.S. Dist. LEXIS 102085, at *60 (D.N.J. Sept. 27, 2010) **[*36]** (dismissing § 502 (a)(3) and § 502(a)(1)(B) claim because the plan administrator did not act improperly). Section 502(a)(3) is principally concerned with ensuring that plaintiffs can obtain appropriate equitable relief for ERISA violations that cause injuries that are not otherwise redressable under ERISA's civil claim provision. See Varity Corp, 516 U.S. at 512. If, as in this case, the sole basis for the plaintiff's § 502(a)(3) claims is that the administrator denied benefits in an arbitrary manner, the standard for reviewing the administrator's decision is the same as the standard for reviewing denial of benefits under § 502(a)(1)(B). And, if the administrator discharges his fiduciary duties by applying the plan pursuant to its terms, then there is no underlying ERISA violation upon which to base either a § 502(a)(3) or § 502(a)(1)(B) claim for equitable relief. See Zurawel, 2010 U.S. Dist. LEXIS 102085, at *60.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Leave to Amend Pursuant to Rule 15

Standard also argues that Plaintiff's Second Amended Complaint should be dismissed because Plaintiff filed the Complaint without obtaining leave of the Court. Because the Court determines that the Second Amended Complaint should be dismissed **[*37]** on the merits for failure to state a claim pursuant to Rule 12(b)(6), the Court does not address Standard's alternative procedural argument that it should be dismissed for failure to obtain leave of the Court pursuant to Rule 15. However, counsel for Plaintiff would be well served to take heed of both the Federal Rules of Civil Procedure and the Local Civil Rules before making any future filings in this Court.

## IV. CONCLUSION

For the reasons discussed above, the Court grants Standard's motion to dismiss the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b) (6). An appropriate Order shall enter.

Dated: 5/2/2011

/s/ Robert B. Kugler

ROBERT B. KUGLER

United States District Judge

# EXHIBIT E

Citation # 3
2006 US dist Lexis 53720

◆ Positive , As of May 20 , 2013

RACHEL B. MORLEY, Plaintiff, v. AVAYA INC. LONG TERM DISABILITY PLAN FOR SALARIED
EMPLOYEES, et al., Defendants.

CIVIL ACTION NO. 04-409 (MLC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2006 U.S. Dist. LEXIS 53720

August 3, 2006, Filed

NOTICE: [*1] NOT FOR PUBLICATION

CORE TERMS: disclosure, administrative record, offset, plan administrator's, disability, summary
judgment, by-laws, administrator, arbitrary and capricious, disability benefits, fiduciary, standard
of review, fiduciary duty, eligibility, denial of benefits, compensation benefits, guideline, advisor,
temporary, beneficiary, heightened, claimant's, bias, discretionary authority, social security,
settlement, entitlement, novo, workers' compensation, letter dated

COUNSEL: For RACHEL B. MORLEY, Plaintiff: KEVIN E. BARBER, NIEDWESKE BARBER, PC,
MORRISTOWN, NJ.

For AVAYA INC. LONG TERM DISABILITY PLAN FOR SALARIED EMPLOYEES, GATES MCDONALD,
INC., PLAN ADMINISTRATOR OF THE AVAYA INC. LONG TERM DISABILITY PLAN FOR SALARIED
EMPLOYEES, AVAYA INC. BENEFIT CLAIM AND APPEAL COMMITTEE, Defendants: KORI ANN
CONNELLY, SWARTZ CAMPBELL LLC, PHILADELPHIA, PA.

JUDGES: Mary L. Cooper, United States District Judge.

OPINION BY: Mary L. Cooper

OPINION

MEMORANDUM OPINION

COOPER, District Judge

The parties have filed various motions and cross motions for summary judgment in an Employee
Retirement Income Security Act ("ERISA") action brought by the plaintiff, Rachel B. Morley. Morley
asserts claims against the defendants, Avaya Inc. ("Avaya") Long Term Disability Plan for Salaried
Employees ("Avaya LTD Plan"), Gates McDonald, Inc. ("Gates"), Plan Administrator of the Avaya
LTD Plan ("Plan Administrator"), and Avaya Benefit Claim and Appeal Committee ("BCAC")
(collectively, "the defendants"), for (1) wrongful denial of benefits under 29 U.S.C. § ("Section")
1132(a)(1)(B), (2) breach of fiduciary duty, and (3) disclosure penalties under Section [*2] 1132
(c). (Compl.)

The defendants move for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule")
56(c) seeking to have the Court apply an "arbitrary and capricious" standard of review to
determine Morley's entitlement to LTD benefits under the Avaya LTD Plan. (Dkt. entry no. 27.)

Morley cross-moves for summary judgment seeking to have the Court review her wrongful denial of LTD benefits claim under a de novo standard. (Dkt. entry no. 31.) The Court will (1) deny the part of the cross motion to determine the standard of review to the extent it seeks to have the Court apply a de novo standard, and (2) deny without prejudice the part of the cross motion to the extent it seeks to have the Court apply a heightened arbitrary and capricious standard of review. The Court will also (1) grant the part of the motion seeking to have the Court apply an arbitrary and capricious standard of review, and (2) deny without prejudice the part of the motion seeking to have the Court apply the arbitrary and capricious standard of review without heightened scrutiny.

The defendants have also separately moved for summary judgment on Morley's **[\*3]** claim for disclosure penalties under <u>Section 1132(c)</u>. (Dkt. entry no. 28.) Morley has cross-moved for summary judgment seeking an award of penalties on this claim. (Dkt. entry no. 30.) The Court will (1) grant the motion seeking dismissal of the disclosure claim, and (2) deny Morley's cross motion seeking an award of disclosure penalties.

The defendants have moved for summary judgment seeking to offset (1) social security disability benefits, (2) workers' compensation benefits, and (3) monies paid as part of an employment discrimination lawsuit, against any potential award of LTD benefits. (Dkt. entry no. 29.) The Court will (1) grant the part of the motion seeking an offset of (a) social security benefits, and (b) temporary workers' compensation benefits, (2) deny the part of the motion seeking an offset for monies paid to Morley as part of her employment discrimination lawsuit against Avaya, and (3) deny without prejudice the part of the motion seeking an offset for any award of permanent workers' compensation benefits.

The defendants also move for summary judgment on (1) the breach of fiduciary duty claim, and (2) the wrongful denial of benefits claim as to BCAC and Gates. (Dkt. **[\*4]** entry no. 45.) The Court will grant the motion.

The defendants have also moved, and Morley has cross-moved, to determine the scope of the administrative record. (Dkt. entry nos. 46, 47.) The Court, for the reasons stated herein, will (1) grant the part of the motion seeking to include all documents reviewed by both BCAC Committees (through December 10, 2004), and (2) deny the part of the cross motion seeking to limit the scope of the administrative record to include only those documents submitted from December 2001 (for BCAC's first review) through the commencement of this litigation on January 29, 2004. The Court will also (1) grant the part of the motion seeking to exclude certain documents, including proposed exhibits 4, 14, 67, 77, 80, 132-133, 141-142, 144, and 147-152, and (2) deny without prejudice the part of the motion seeking to exclude proposed exhibits 11, 35-37, 47-48, 98-99, and 134-35. The Court will further (1) grant the part of the cross motion seeking to (a) exclude records relating to Morley's superior court litigation against Avaya from the administrative record, and (b) include the (i) January 23, 2002 report of John Knightly, MD, (ii) January 30, 2002 job description **[\*5]** prepared by James Bird of Avaya, (iii) March 11, 2004 report of Allyson K. Hurley, DDS, and (iv) February 10, 2003 medical report by Donald H. Frank, MD, in the administrative record, (2) deny the part of the cross motion insofar as it seeks to exclude from the administrative record (a) any "guidance, comments, or information" provided by BCAC Medical Advisor Alladin Motta, MD, and (b) the report of Joseph Basinger, MD, and (3) deny without prejudice the part of the cross motion to the extent that it seeks to include in the administrative record proposed exhibit 11.

## BACKGROUND

### I. Materials Considered

The Court has, in addition to the other documents of record, considered:

(1) Defendants' Brief in Support of Motion for Summary Judgment to Determine the Standard of Review ("Defs. Standard Br.") and January 27, 2006 Certification of Kori A. Connelly, Esq. ("1-27-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 27.)

(2) Defendants' Brief in Support of Motion for Partial Summary Judgment on Disclosure Claim ("Defs. Disclosure Br.") and January 27, 2006 Connelly Certification ("1-27-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry [*6] no. 28.)

(3) Defendants' Brief in Support of Motion for Summary Judgment as to the LTD Offset Issue ("Defs. Offset Br.") and January 29, 2006 Connelly Certification ("1-29-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 29.)

(4) Plaintiff's Brief in Support of Cross Motion for Summary Judgment on Disclosure Penalties ("Pl. Disclosure Br.") and January 27, 2006 Certification of Matthew Justice Vance, Esq. ("1-27-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 30.)

(5) Plaintiff's Brief in Support of Cross Motion for Summary Judgment to Determine the Standard of Review ("Pl. Standard Br.") and January 27, 2006 Vance Certification ("1-27-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 31.)

(6) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment on Disclosure Penalties ("Defs. Disclosure Opp. Br.") and February 10, 2006 Connelly Certification ("2-10-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 33.)

(7) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment to Determine the Standard of Review ("Defs. Standard Opp. Br.") and February 10, 2006 Connelly Certification [*7] ("2-10-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry no. 34.)

(8) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment as to LTD Offset Issue ("Pl. Offset Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 35.)

(9) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment on the Disclosure Claim ("Pl. Disclosure Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 36.)

(10) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Determine the Standard of Review ("Pl. Standard Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. III"), with attached exhibits. (Dkt. entry no. 37.)

(11) Defendants' Brief in Opposition to Plaintiff's Cross Motion to Determine the Standard of Review ("Defs. Standard Opp. Br.") and February 10, 2006 Connelly Certification ("2-10-06 Connelly Cert. III"), with attached exhibits. (Dkt. entry no. 38.)

(12) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment to Determine the Standard of [*8] Review ("Pl. Standard Reply Br.") and February 27, 2006 Vance Certification ("2-27-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 40.)

(13) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment on Disclosure Penalties ("Pl. Disclosure Reply Br."). (Dkt. entry no. 41.)

(14) Defendants' Reply Brief in Support of Motion for Partial Summary Judgment on Disclosure Claim ("Defs. Disclosure Reply Br.") and March 2, 2006 Connelly Certification ("3-2-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 42.)

(15) Defendants' Reply Brief in Support of Motion for Summary Judgment as to LTD Offset Issue ("Defs. Offset Reply Br.") and March 2, 2006 Connelly Certification ("3-2-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry no. 43.)

(16) Defendants Brief in Support of Motion for Summary Judgment on Plaintiff's Breach of Fiduciary Duty Claim ("Defs. Fiduciary Br.") and March 14, 2006 Connelly Certification ("3-14-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 45.)

(17) Defendants' Brief in Support of Motion for Summary Judgment to Determine the Scope of the Administrative Record ("Defs. Admin. Rec. Br."). (Dkt. [*9] entry no. 46.)

(18) Plaintiff's Brief in Support of Cross Motion for Summary Judgment to Settle the Contents of the Administrative Record ("Pl. Admin. Rec. Br.") and March 14, 2006 Vance Certification ("3-14-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 47.)

(19) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment to Settle the Contents of the Administrative Record ("Defs. Admin. Rec. Opp. Br.") and March 20, 2006 Connelly Certification ("3-20-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 48.)

(20) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment on Breach of Fiduciary Duty Claim ("Pl. Fiduciary Opp. Br.") and March 20, 2006 Vance Certification ("3-20-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 49.)

(21) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Determine the Scope of the Administrative Record ("Pl. Admin. Rec. Opp. Br.") and March 20, 2006 Vance Certification ("3-20-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 50.)

(22) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment to Settle the Contents [*10] of the Administrative Record ("Pl. Admin. Rec. Reply Br.") and March 27, 2006 Vance Certification ("3-27-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 51.)

## II. Factual And Procedural History

### A. Morley's Employment at Avaya & Alleged Injury

Morley is a former Avaya employee who was injured in December 2001. (Dkt. entry no. 39, Joint Final Pretrial Order ("Pretrial Ord."), at 4.) Avaya had formerly employed Morley as a manager responsible for services on corporate flights. (1-29-06 Connelly Cert., at Ex. A, 12-20-04 Morley Dep. Tr. ("Morley Tr."), at 19.) [1] Morley's responsibilities included, inter alia, (1) managing a small flight attendant staff, (2) requisitioning and delivering catering services on flights, (3) budgeting for staff and catering, (4) establishing maintenance of cabin safety, and (5) delivering in-flight services. (Morley Tr., at 19-24.) Morley testified that she injured her back by lifting and carrying food trays while attending a culinary training class on December 21, 2001. (Id. at 48-50.) Morley suffered a herniation of the L5-S1 intervertebral disc. (1-29-06 Connelly Cert., at Ex. B, Attending Physician, Dr. John Knightly's [*11] 6-7-02 Stmt. of Disability for Morley.) Morley's last day of work with Avaya was December 21, 2001. (Pretrial Ord., at 4.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] Morley had worked as a corporate flight attendant for Avaya's predecessor, Lucent Technologies ("Lucent"). (Morley Tr., at 18.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### B. Morley's Application to Gates for LTD Benefits & Terms of LTD Plan

Morley initially received short-term disability benefits from Avaya, and she applied for LTD benefits under the Avaya LTD Plan in July 2002 after her short-term disability benefits expired. (Compl., at P 16; Pretrial Ord., at 4.) Morley submitted the claim for LTD benefits to the Claims Administrator, Gates. (Pretrial Ord., at 4.) At the time Morley's benefit claim was under review, the Avaya LTD

Plan operated under a Summary Plan Description ("Avaya SPD"), effective January 1, 2001. (Defs. Standard Br., at 5; 1-27-06 Connelly Cert. I, at Ex. A, Avaya SPD.) ² The Avaya SPD provides in pertinent part the following "Claim Denial and Appeal Procedure[]":

> Participants . . . have **[*12]** the right under ERISA and the LTD Plan to file a written claim for benefits with the Claims Administrator [(Gates)].

> If a claim is denied in whole or in part, the claimant will receive a written notice from the Claims Administrator of the Claims Administrator's decision, including the specific reason for the decision, within 90 days after the Claims Administrator received the claim. The written notice will include[, inter alia,] [t]he specific reason(s) for the denial . . . .

> \* \* \*

> If you submit your claim according to the procedures described in this section and you do not hear from the Claims Administrator within the time limits given here, your claim is considered denied.

> If a claim for benefits is denied in whole or in part, or if you . . . believe that benefits under the LTD Plan to which you are entitled have not been provided, an appeal process is available to you. You . . ., or your authorized representative may appeal in writing within 180 days after the denial is received or the 45-day period (as extended) period [sic] has expired.

> **Appeal Procedures**

> A claimant can appeal a denied claim if[, inter alia,] . . . [w]ritten denial **[*13]** of the claim is received within the appropriate time frame and the claimant wants to appeal it.

> If you wish to file an appeal, you must do so in writing within 180 days of receiving notification of the Claims Administrator's decision. You are entitled to request a copy and review the LTD Plan "Plan Document" when you prepare your appeal. If you believe an error has occurred, you can support your request by giving the reason you think there is an error. . . . Send a written request for review of any denied claim directly to the Claims Administrator[.]

> The Claims Administrator will conduct a review and make a final decision within 60 days after receiving the written request for review.

> Although this decision is final and not subject to further review, you . . . may have additional rights under ERISA. However, applicable law and the LTD Plan's provisions require you to pursue all your claim and appeal rights on a timely basis before seeking any other legal recourse regarding claims for benefits.

(Avaya SPD, at 17-19 (emphasis in original).) The Avaya SPD further states that the Plan Administrator has

> full discretionary authority and power to control **[*14]** and manage all aspects of the LTD Plan, to determine eligibility for LTD Plan benefits, to interpret and construe the terms and provisions of the LTD Plan, to determine questions of fact and law, to direct disbursements, and to adopt rules for the administration of the LTD Plan as they may deem appropriate in accordance with the terms of the LTD Plan and all applicable laws.

(Id. at 21.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

2 Lucent "spun off" Avaya in October 2000, such that "originally all of the Avaya Plans were Lucent Plans." (Defs. Standard Br., at 5; 1-27-06 Connelly Cert. I, at Ex. B, 2-3-05 Ronald M. Hershkowitz Dep. Tr. ("Hershkowitz Tr."), at 99.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Avaya SPD indicates that it "is designed to describe the Avaya [LTD Plan] in easy-to-understand terms. It is shorter and less technical than the legal LTD Plan document. However, it is the Plan document and contract that determine your rights under the Plan. In all instances, the Plan document will govern." (Id.)

Lucent's "Long-Term Disability Plan for Management Employees" **[*15]** (the "Lucent LTD Plan") was also operative before the promulgation of the Avaya LTD Plan and was the basis of the Avaya SPD. (1-27-06 Connelly Cert. I, at Ex. C., 9-15-04 Aff. of Shelley Anderson ("Anderson Aff."), at 2.) The Lucent LTD Plan provides that:

> The Claims Administrator shall serve as the final review Committee under the Plan and shall have sole and complete discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents or instruments governing the Plan, any and all questions arising from the administration of the Plan and interpretation of all Plan provisions, determination of all questions relative to participation of Eligible Employees . . . and eligibility for benefits, determination of all relevant facts, the amount and type of benefits payable to any Eligible Employee . . . and construction of all terms of the Plan. The Claims Administrator shall use appeals procedures that comply with the requirements of ERISA.
>
> Notwithstanding the foregoing, Lucent . . . shall have sole and complete discretionary authority to determine questions relating to eligibility of employees for membership in the Plan and to **[*16]** amend or terminate the Plan at any time. Respective decisions by the Claims Administrator and Lucent . . . shall be conclusive and binding on all parties and not subject to further review.

(1-27-06 Connelly Cert. I, at Ex. D, Lucent LTD Plan, at 19.)

The Avaya LTD Plan provides an additional layer of internal appellate review by which claimants may appeal LTD claim denials by the Claims Administrator, Gates, to BCAC. (Anderson Aff., at 1-2; see 1-27-06 Connelly Certif. I, Ex. E, Avaya LTD Plan ("The written request for review of any denied claim or other disputed matter should be sent directly to BCAC.").) The Avaya LTD Plan also states that:

> BCAC shall serve as the final authority under the Plan and shall have sole and complete discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents or instruments governing the Plan, any and all questions arising from administration of the Plan and interpretation of all Plan provisions, determination of all questions relating to participation of Salaried Employees and eligibility for Disability Benefits, determination of all relevant facts, the amount and type of Disability **[*17]** Benefits payable to any Participant, and construction of all terms of the Plan.
>
> * * *
>
> The BCAC shall be the final review committee, with the authority to uphold or overturn

denials of Disability Benefits by the Claims Administrator.

(Id. at AV 01286-01287.) The Avaya LTD Plan further provides, under the heading "Conclusive Determination by the BCAC" that

> [t]he BCAC shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions arising from the administration of the Plan, and shall have sole and complete discretionary authority and control to manage the operation and administration of the Plan, including, but not limited to, the determination of all questions relating to eligibility for participation and Disability Benefits, interpretation of all Plan provisions, determination of the amount and kind of Disability Benefits payable to any Participant . . ., and construction of disputed or doubtful terms. Such decisions shall be conclusive and binding on all parties and not subject to further review.

(Id. at AV 01287.)

Gates denied Morley's claim for LTD benefits by letter dated [*18] August 13, 2002. (Pretrial Ord., at 5.) In the letter, Gates advised Morley that it denied her claim because her doctor, Dr. Knightly, did not "totally disable you from any occupation and to date has not submitted any further medical documentation to support the [LTD] benefit." (Id.)

## C. Morley's Request for Disclosures

Morley's counsel submitted a request for disclosures by letter dated December 20, 2002, addressed to the "Secretary, Avaya [BCAC]", including a carbon copy to the "Plan Administrator." (Id. at 6.) Morley's counsel requested the disclosure of 15 categories of items:

> (1) the Plan's Summary Plan Description;

> (2) the underlying plan document; i.e., the document which is summarized by the Summary Plan Description;

> (3) any Summary of Material Modifications issued since the time Ms. Morley's participation in the Plan commenced;

> (4) the last-filed Form 5500, including any schedules, addenda, and attachments;

> (5) any reports, analyses, documents, and/or opinions generated by, prepared by, or contributed to by Dr. Scott Eisenberg with respect to Ms. Morley;

> (6) any document(s), manual(s), and/or resource(s) relied upon by Dr. [*19] Eisenberg in assessing and/or opining on Ms. Morley's condition; if same is part of a multi-volume treatise or compilation, . . . a copy of the section or subpart containing the above-noted information and provide adequate citations to those portions not provided;

> (7) any schedules, methodologies, procedures, training materials, or any other documents relied upon by any representative of Ms. Morley's former employer, any third-party administrator or service provider, or any representative of an organization affiliated with or related to the plan sponsor in determining Ms. Morley's entitlement to benefits under the Plan (save for those documents provided in response to item # 6 herein);

> (8) with respect to Ms. Morley's participation in the Plan, and save for any information

provided in response to items # 5 and item # 6 herein, any reports, analyses, documents, and/or opinions generated by, relied upon, prepared by, or contributed to by any individual employed by, affiliated with, or associated in any way with the Plan, the plan sponsor, or any third-party administrator;

(9) any document(s), manual(s), and/or resource(s) relied upon by any individual or organization (save **[*20]** for the material provided in response to item # 5 and item # 6 herein) in assessing and/or opining on Ms. Morley's condition; if same is part of a multisection treatise or compilation, . . . a copy of the section or subpart containing the above-noted information and provide adequate citations to those portions not provided;

(10) with respect to Ms. Morley's participation in the Plan, please provide any documents generated by, relied upon, submitted to, prepared by, and/or contributed to by the Concentra Medical Examinations organization or any individual(s) affiliated with, employed by, or in any way connected with same;

(11) any documents which describe, reference, explain, amplify and/or define the phrase "totally disable" as used in Ms. Gail M. Foley's letter to Ms. Morley dated August 13, 2002;

(12) any memoranda, notes, correspondence, computer files, electronic media, video tapes, recordings or any other document(s), or any concepts, ideas, or beliefs the expression of which is affixed in any tangible medium of expression generated with respect to the processing, analysis, review, and/or examination of Ms. Morley, her medical, surgical, health, and/or disability **[*21]** status, and/or her participation in the Plan;

(13) any prior or concurrent analyses performed with respect to Ms. Morley's participating in any plan or arrangement sponsored by the current Plan sponsor and any predecessor organization of or successor organization to the current Plan sponsor (whether or not said plan or arrangement is subject to ERISA) save for those items requested herein;

(14) save for those items provided in response to other requests herein, any schedules, methodologies, procedures, training materials, or any other documents establishing a policy or policies for processing requests for long term disability benefits from the Plan; and

(15) save for those items provided in response to other requests herein, any other documents which relate to any aspect of Ms. Morley's entitlement to benefits, participation in the Plan, and/or the termination of Ms. Morley's benefits[.]

(1-27-06 Connelly Cert. II, at Ex. D, 12-20-02 Letter from Vance to BCAC.)

The Avaya Communication, Health, Environment & Safety Service processed the disclosure request on January 9, 2003. (1-27-06 Connelly Cert. II, at Ex. E, Defs. Answer to Request for Admissions No. 1.) **[*22]** BCAC, by letter dated January 29, 2003, provided Morley's counsel with a copy of (1) the Avaya SPD, (2) the Lucent LTD Plan, (3) a request to extend time to file a Form 5500, (4) the medical file from Gates, including (a) the Gates case summary, (b) claim log notes, (c) medical reports from Dr. Kaufman, (d) a Physician's Report dated January 9, 2002, (e) a report from Jane F. Kaiser, R.N., A.P.N., and (f) a report from Kristen Westa MSPT, and (4) a U.S. Compensation & Benefits News Special Report. (Pretrial Ord., at 6-7.) Hershkowitz, an attorney for BCAC, participated in a telephone conversation with Morley's counsel, Matthew Vance, on January 29, 2003. (Id.) During this conversation, Hershkowitz advised Vance that Avaya could not provide all of the requested information within the 30-day period, and extended the time for Morley to file her appeal because of the inability to produce the documents within 30 days of the date of her letter.

(Id.) No summary of material modifications was made as of the time of Morley's request for disclosures other than as provided to her in the January 29, 2003 response. (Id. at 7.)

## D. Morley's Appeal to BCAC

Morley appealed Gates's **[\*23]** denial of her LTD benefit claim by letter from her attorney dated February 11, 2003. (Id. at 5.) Shelley Anderson, Secretary for BCAC, advised Morley -- through her attorney -- by letter dated March 17, 2003, that BCAC tabled her appeal at its March 17, 2003 meeting until April 4, 2003. (Id.) BCAC informed Morley, by letter dated April 24, 2003 to her attorney, that BCAC denied her appeal for LTD benefits at an April 18, 2003 meeting. (Id.)

## E. The Complaint

Morley brought this action against the defendants on January 29, 2004. (Dkt. entry no. 1.) In Count I of the complaint, Morley alleges that the defendants wrongfully denied her claim for LTD benefits. (Compl., at 7-8.) Morley asserts in Count II that the defendants breached their fiduciary duty to her in violation of <u>Section 1104</u>. Morley alleges that the defendants "fail[ed] to provide her the basic due process guarantees required by <u>29 U.S.C. § 1133</u>" by (1) wrongfully denying a full, fair and impartial review of her benefits claims; (2) ignoring records and opinions of her treating physicians showing she is disabled; and (3) providing a "claim denial and appeal denial which fails to **[\*24]** provide certain items of information required in such denials." (Compl., at 8-9.) Morley also asserts that the defendants violated ERISA by failing to disclose certain documents to her. (Compl., at 9.) Morley seeks:

> 1. . . . [D]eclaratory and injunctive relief, finding that she is entitled to long-term disability benefits under the terms of the Plan and that [the d]efendants be ordered to pay long-term disability benefits according to the terms of the Plan until such time as . . . [she] is no longer disabled or reaches the age of 65;

> 2. . . . [A]warding . . . [her] the full $ 110.00 per-item, per-day penalty permitted by Title I of ERISA and the implementing regulations[;]

> 3. . . . [A]warding [her] all reasonable attorneys fees and expenses incurred as a result of [the] defendants' wrongful denial in providing coverage pursuant to 502(g)(1) of ERISA, <u>29 U.S.C. § 1132(g)</u>[; and]

> 4. . . . [A]ward for such other relief as may be just and appropriate.

(Compl., at 9-10 (emphasis in original).) The defendants answered the complaint on April 29, 2004. (Dkt. entry no. 7.)

## F. BCAC's Second Review of Morley's Claim

**[\*25]** BCAC advised Morley by letter dated August 20, 2004, that it was meeting in September 2004, and would vote as to whether it would rehear her appeal since she had submitted three additional letters not in time for the original hearing. (Pretrial Ord., at 5.) The three letters included: (1) Dr. Marcia Sherman's April 11, 2003 report; (2) Dr. John Knightly's May 2, 2003 report; and (3) Dr. John Knightly's May 5, 2003 report. (Id. at 6.) BCAC agreed at a September 17, 2004 meeting to rehear Morley's appeal with the new documentation. (Id.) BCAC sent Morley's medical documentation in October 2004 to Dr. Joseph Basinger for his independent medical review. (Id.) Dr. Basinger prepared a report dated October 25, 2004. (Id.) BCAC provided a copy of that report to Morley. (Id.) At the BCAC meeting on December 10, 2004, BCAC again voted to deny Morley's appeal and entitlement to LTD benefits. (Id.)

## DISCUSSION

# I. Standard For Summary Judgment

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue **[*26]** as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the movant has met this prima facie burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla **[*27]** of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

# II. Applicable Standard Of Review To Morley's Benefits Claim

## A. Standards of Review

A district court should review a denial of ERISA plan benefits under a de novo standard of review "unless **[*28]** the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). If the plan confers such discretion, a district court should apply a deferential "arbitrary and capricious" standard. Id. at 111-12; Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 194 (3d Cir. 2002). Under the arbitrary and capricious standard, a district court will uphold a plan administrator's interpretation of a plan if it is reasonable, i.e., unless the plan administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Pinto v. Reliance Stand. Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [plan administrator] in determining eligibility for plan benefits." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).

"If a benefit plan gives discretion to an administrator **[*29]** or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115; see Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004) ("[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations."). Thus,

"when an insurance company both funds and administers benefits, it is generally acting

under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." [Pinto, 214 F.3d at 378]. This "heightened" form of review is to be formulated on a sliding scale basis, which enables [a court] to "review[] the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of beneficiaries." [Id.] at 391 (quoting Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993)). [*30] In employing the sliding scale approach, [courts] take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact "the presumed desire to maintain employee satisfaction." [Id.] at 392.

Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004).

## B. Application of The De Novo Standard of Review Is Not Warranted

Morley contends that the Court should apply a de novo standard of review because the Avaya LTD Plan provides conflicting and ambiguous grants of discretion regarding employee plan eligibility between the Claims Administrator, Gates, and the Plan Administrator (or BCAC). (Pl. Standard Br., at 2.) Morley notes that the Plan provides that, inter alia, the Claims Administrator -- Gates -- "shall serve as the final review committee under the Plan and shall have sole and complete discretionary authority to determine conclusively for [*31] all parties . . . eligibility for benefits." (Id. at 4 (quoting Lucent LTD Plan, at 19).) Morley argues that this language shows that Gates is the final decision-maker as to eligibility under the Plan. (Id.)

Morley asserts that the Avaya SPD, however, provides the Plan Administrator with a conflicting grant of authority because it states that the "Plan Administrator has the full discretionary authority and power to control and manage all aspects of the LTD Plan." (Id. (quoting Avaya SPD, at 21).) Morley contends that this grant of discretion to the Plan Administrator "directly conflicts" with the authority provided to Gates under the Plan. (Id.) Further, Morley points out that, to the extent that the defendants argue that BCAC is the final authority under the Plan, BCAC's by-laws provide no authority for BCAC to resolve long-term disability disputes; rather, the By-Laws "only provide authority for BCAC review of denials involving short term disability, pensions, and sickness and accident disability payments." (Id.)

Morley also asserts, assuming the Court finds no conflict in the grant of discretion, that she is entitled to de novo review because the Plan Administrator [*32] failed to properly exercise its discretion, as shown by "procedural irregularities and [the] magnitude of claims filing errors." (Id.) Morley contends that BCAC "usurped" Gates's discretion to serve as the final review committee under the Plan by acting as the "sole arbiter" of her appeal. (Id. at 7-8.) Morley also asserts that the defendants committed a "multitude" of administrative errors and demonstrations of bias towards her including, inter alia, (1) misinforming Morley of the proper time period in connection with her appeal rights, (2) characterizing the report of Morley's vocational capacity evaluator as "wordy BS," and (3) shredding materials generated during BCAC meetings. (Id. at 8-13.)

The defendants argue that the Avaya plan documents "contain a 'clear and unequivocal' expression of intent to confer discretion on the Plan Administrator or its delegate the BCAC." (Defs. Standard Br., at 9.) The defendants point out that the Avaya SPD confers to Gates "unfettered decision-making authority as to benefit determinations." (Def. Standard Opp. Br., at 4.) Also, the Avaya SPD establishes appeal procedures by which claimants may submit an appeal to Gates. ( [*33] Id. (citing Avaya SPD at 18).) The defendants assert that the plan documents then provide claimants an "internal review process" by which LTD claim determinations by "Gates may be appealed by claimants to the Plan Administrator, Avaya, which has established an internal [BCAC] to hear and decide appeals of claim denials." (Id. at 5.)

The defendants assert that the Avaya SPD provides that the Plan Administrator has "'the full discretionary authority and power to control and manage all aspects of the LTD Plan, . . . and to adopt rules for the administrator of the LTD Plan as they may deem appropriate in accordance with the terms of the LTD Plan and all applicable laws.'" (Id. at 6 (quoting Avaya SPD).) The defendants assert that the Plan Administrator, pursuant to this authority, delegated to BCAC the authority to review and make final decisions regarding appeals from LTD benefit determinations by Gates. (Id. at 5.) The defendants state that the Avaya LTD Plan provides that "BCAC shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions . . .." (Id. at 6-7.) The defendants describe the BCAC **[*34]** appeal process as "provid [ing] an added measure of security for Plan Participants[, like Morley,] who contest the claims denials by Gates." (Id. at 5-6.)

The Court finds that the plan documents do not show a conflicting grant of discretion to justify applying a de novo standard of review to Morley's claim for wrongful denial of LTD benefits. In determining whether the Avaya LTD Plan grants clear discretion, the Court must examine the Plan language employing general principles of contract interpretation. Firestone, 489 U.S. at 112. The plan documents provide that the Plan Administrator retains full discretionary authority despite the initial grant of authority to Gates to administer LTD benefit claims. Pursuant to this authority, the Plan Administrator has delegated BCAC as the final review committee and the final authority for overturning or affirming LTD claim denials made by Gates. BCAC also has sole and complete discretionary authority for "the determination of all questions relating to the eligibility for participation and disability benefits." (Avaya LTD Plan, at AV 01287.) Although Gates is the initial decision-maker for LTD benefit claims, BCAC **[*35]** is involved as a second level internal appeals process for claim denials. The Plan Administrator, or BCAC as its delegatee, retains final authority regarding LTD benefit claims. Therefore, the Court will apply an arbitrary and capricious standard of review to Morley's wrongful denial of benefits claim. [3]

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[3] Morley's reliance on the BCAC by-laws and Gritzer v. CBS, Inc., 275 F.3d 291 (3d Cir. 2002) in support of her argument for the application of de novo review is misplaced. First, the BCAC by-laws are not part of the Avaya LTD Plan, and Morley has pointed to no language in any of the plan documents incorporating the by-laws. Thus, the Court will not consider the by-laws to analyze this issue. Second, as discussed above, procedural irregularities or bias is a consideration in determining the level of "heightened" review if the Court applies the arbitrary and capricious standard. In Gritzer, the Third Circuit concluded that the deferential arbitrary and capricious standard was not applicable -- irrespective of the plan language -- where the Plan Administrator failed to make any decision during the pendency of the claim. 275 F.3d at 296. Here, the facts are undisputed that (1) Gates informed Morley of the reason for the denial of benefits, and (2) BCAC communicated the grounds for affirming the denial. As such, Gritzer is inapplicable to the facts here.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## **[*36] C. Application of The Pinto Factors to Determine The Proper Level of Arbitrary And Capricious Review**

The Court, "[i]n employing the sliding scale approach [to determine the appropriate level of arbitrary and capricious review, must] take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary . . .." Stratton, 363 F.3d at 254. As to the first factor, the defendants contend that "although Morley is an individual presumably with no experience in employee benefit administration, the record demonstrates that she was represented by experienced ERISA benefits counsel during the pendency of the appeals process." (Defs. Standard Br., at 14.) Thus, they argue that "[n]o evidence exists to suggest that Morley was at any disadvantage in dealing with either

Gates . . . or BCAC in pursuing her benefit claim by virtue of any comparative inexperience in ERISA matters." (Id.) Concerning the second factor, the defendants assert that Morley provided [*37] Gates and Avaya with all of the information they used to address Morley's claim. (Id.)

The defendants admit, for purposes of the third factor, that Gates is compensated by Avaya on a per claim basis. (Anderson Aff.) However, the defendants contend that the Court should apply only a slightly heightened arbitrary and capricious standard because of the similarity between the Avaya LTD Plan and the plan discussed by Stratton. (Def. Standard Opp. Br., at 12-14.) Finally, the defendants assert that Morley presents only one claim for LTD benefits and there is a lack of evidence that the value of the claim would significantly affect "a sizeable employer such as Avaya." (Id. at 13.)

Morley, although conceding that she was represented by counsel during the appeal period, claims that the first Pinto factor weighs in favor of heightening the standard of review because she was not so represented during the initial claim period before Gates. As for the second factor, Morley contends that she was unaware of some of the information that Gates and BCAC considered, including information provided by "Avaya's Dr. Aladdin Motia." (Pl. Standard Opp. Br., at 7.) Morley argues that the defendants [*38] were also acting under a financial conflict of interest shown by various procedural irregularities and demonstrations of bias. (Id.; Pl. Standard Br., at 14-15.) Concerning the fourth factor, Morley contends that Avaya's financial condition would potentially be significantly affected by any payment of LTD benefits to her because less than 30 participants out of a total of 8,194 receive benefits. (Id.)

The Court finds that an analysis of the four Pinto factors justifies at least a slightly heightened arbitrary and capricious standard of review. The second and fourth factors do not justify heightening the arbitrary and capricious standard. Regarding information accessibility, Morley has only generally alleged that she was denied information and only vaguely refers to "an example of the imbalance [of information] involves Avaya's Dr. Aladdin Motia." (Pl. Standard Opp. Br., at 7.) The Court has found no other references to information that the defendants allegedly withheld from Morley. As for the fourth factor, the record is unclear as to the potential effect of Morley's claim on Avaya's financial structure, although it appears highly unlikely that one claim would negatively [*39] impact such a large company. Morley has also offered no evidence regarding the financial health or long terms plans of Avaya that would undermine the "presumed desire to maintain employee satisfaction." Pinto, 214 F.3d at 392.

The first and third factors, however, justify at least a slightly heightened arbitrary and capricious standard of review. Concerning the first factor, there appears to have been a sophistication imbalance between the parties during the initial claims process, as Morley was only represented by counsel during the appeal of her benefits claim denial. Also, the third factor - the financial arrangement between Gates and Avaya -- warrants a slight heightening of the arbitrary and capricious standard.

Arrangements in which an employer either (1) funds a plan and pays an independent third party to interpret the plan and make plan benefits determinations, or (2) establishes a plan, ensures its liquidity, and creates an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits, do not, in themselves, constitute a Firestone conflict of interest. Pinto, 214 F.3d at 383. Here, Avaya [*40] (1) established BCAC, an internal benefits committee to review, inter alia, LTD benefit claim denials, and (2) pays Gates on a per claim basis to serve as the Claims Administrator. Therefore, the Avaya LTD Plan could qualify as either of the two types of arrangements. As in Stratton, Morley has shown "no evidence that would give rise to an inference of conflict other than the fact that [Avaya] both funds and ultimately administers its own plan after outsourcing the initial phases of administration." 363 F.3d at 255. Therefore, the Court will heighten slightly the arbitrary and capricious standard to "accommodate what appears to be a potential, even if negligible, chance of conflict." Id.

## D. Other Considerations to Potentially Justify Heightening The Arbitrary And Capricious Standard

Morley has also alleged a variety of procedural irregularities and demonstrations of bias that she argues would justify the Court heightening the arbitrary and capricious standard. A heightened arbitrary and capricious standard may be appropriate if a plaintiff shows

> "demonstrated procedural irregularities, bias or unfairness in the review [by the plan administrator] **[*41]** of the claimant's application for benefits." Kosiba, 384 F.3d at 66; Vitale[v. Latrobe Area Hosp., 420 F.3d 278, 283 (3d Cir. 2005).] This can come in the form of the either (a) plan administrator's "self-serving" use of one doctor's expertise; (b) inconsistent treatment of the same facts; and (c) when at a "crossroads," the plan administrator disfavors the claimant. Pinto, 214 F.3d at 393-94; see also Kosiba, 384 F.3d at 66. However, the claimant bears the burden of proving procedural bias or bad faith by presenting the court with specific evidence of bias. See Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 216 (3d Cir. 2001) ("Unless specific evidence of bias or bad-faith has been submitted, plans . . . are reviewed under the arbitrary and capricious standard["]); see also Goldstein v. Johnson & Johnson, 251 F.3d 433, 435-36 (3d Cir. 2001) (heightened arbitrary and capricious review is required when "the beneficiary has put fourth [sic] specific evidence of bias or bad faith in his or her particular case[]").

Michaux v. Bayer Corp., 2006 U.S. Dist. LEXIS 46646 , No. 05-1430, 2006 WL 1843123, **[*42]** at *6 (D.N.J. June 30, 2006).

Morley alleges that the defendants committed a variety of administrative errors and examples of bias including, inter alia, (1) misinforming Morley of the proper time period to appeal, (2) handwritten notes and comments on Morley's appeal letter and other documents, and (3) shredding materials generated during BCAC meetings. (Pl. Standard Br., at 8-13.) The defendants point out that Hershkowitz, a legal advisor to BCAC, testified at his deposition that he made the handwritten notes on Morley's appeal letter and on the responses to her exhibits prior to the BCAC hearing. (Defs. Standard Opp. Br., at 15.) The defendants also state that there is a dispute as to whether BCAC destroys copies of hearing items. (Id. at 16.) The Court finds that there are disputed issues of material fact regarding the possible procedural irregularities and potential bias by BCAC. Therefore, the Court will defer a final determination as to the applicable level of "heightened" arbitrary and capricious standard of review until resolving these factual disputes at trial.

## III. Disclosure Penalties

## A. Disclosure Requirements

ERISA requires the disclosure of **[*43]** particular information by a Plan Administrator. Specifically, the Plan Administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement or contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Section 1132(c)(1)(B) provides that

> [a]ny administrator . . . who fails or refuses to comply with a request for information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $ 100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

Id.

If an administrator does not comply **[\*44]**  with a request within the specified time, the Court has the discretion to assess a civil penalty. See Romero v. Smithkline Beecham, 309 F.3d 113, 120 (3d Cir. 2002) (explaining that "[s]ection 502(c)(1), as noted, provides that a penalty may be imposed 'in the court's discretion' and that any such penalty may be in any amount 'up to $ 100 a day'"). "Appropriate factors to be considered in making these decisions include bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." Id. (citations and internal quotations omitted). Although prejudice is a factor for consideration, it is not "a sine qua non to a valid claim under section 502(c)(1)." Id.

## B. The Defendants Complied With Disclosure Requirements

The defendants contend that the Plan Administrator fully complied with ERISA's disclosure requirement. Morley argues that she was entitled to, and did not receive, the (1) BCAC by-laws, and (2) service agreement between Gates and Avaya. **4** The Court finds that Morley is not entitled to any penalties.  **[\*45]**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

**4** Morley originally asserted that the Plan Administrator failed to disclose four documents: (1) a written statement indicating the length of her extension, (2) Medical Disability Advisor, by Presley Reed, M.D., (3) BCAC's by-laws, and (4) claims management guidelines. Morley has withdrawn her claims as to the written statement indicating the length of the extension, and the Medical Disability Advisor. (Pl. Disclosure Reply Br., at 1.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

1. BCAC by-laws

Morley asserts that she requested information that would have included the BCAC by-laws in her disclosure request. (Pl. Disclosure Br., at 15.) Morley argues that because the BCAC by-laws "essentially establish the governing body for resolving certain aspects of benefits requests, it is clearly a document 'under which the plan is established or operated.'" (Id. (quoting 29 U.S.C. § 1024(b)(4)).) Morley indicates that she was prejudiced by not having a copy of the BCAC by-laws because she would have been made aware that BCAC **[\*46]**

    (1) included a legal advisor, and any prepared materials by the legal advisor would have been discoverable;

    (2) has a formal medical advisor, and she would have had the opportunity to inquire as to the medical advisor's opinion of her condition; and

    (3) had no authority pursuant to its by-laws to resolve long-term disability claims.

(Id. at 16-18.)

The defendants claim that Morley's December 20, 2002 disclosure request did not include a request for the BCAC by-laws. (Defs. Disclosure Opp. Br., at 18.) The defendants assert that "Morley's request to produce documents establishing a policy for processing requests for LTD benefits is not sufficiently specific to describe" the BCAC by-laws. (Id.) Therefore, the defendants argue that they had no duty to disclose the by-laws under Section 1024(b)(4). (Id.)

The defendants also point out that the BCAC by-laws are not one of the specifically enumerated documents required to be disclosed under Section 1024(b)(4). (Id.) The defendants assert that the "BCAC By-laws do not address how the Avaya LTD Plan is operated; rather, it sets forth the organization, membership and voting rights of the BCAC Committee. **[\*47]** " (Id. at 19.) The defendants further state that the BCAC by-laws do not (1) contain any information that would have assisted Morley in perfecting her appeal, (2) address a claimant's rights under the Avaya LTD Plan, or (3) provide any information about the definition of "disability" under the Plan. (Id.) The defendants also contend that Morley's allegations of prejudice -- the inability to request materials prepared by or opinions of advisors to the BCAC -- are irrelevant to the defendants' duty to disclose documents to assist her in perfecting her appeal under Section 1024(b)(4). (Id. at 19-20.)

The Court finds that Morley did not specifically request a copy of the BCAC by-laws in her disclosure request of December 20, 2002. None of the 15 submitted requests, and in particular requests # 7 and 15 (specifically referred to by Morley in her brief), include an explicit request for the BCAC by-laws. Morley has not identified how the BCAC by-laws would constitute a "schedule[], methodolog[y], procedure[], training material[], or any other document[] relied upon . . . in determining [her] entitlement to benefits under the Plan" as requested in request # 7. Moreover, **[\*48]** Morley has not demonstrated that the by-laws constitute "any other documents which relate to any aspect of [her] entitlement to benefits, participation in the Plan, and/or the termination of her benefits[.]"

Even assuming for purposes of this motion and cross motion, that Morley had, in fact, included a request for the BCAC by-laws in her disclosure request, the BCAC by-laws is not a plan document or a document "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). A document "under which the plan is established or operated" is not just "any document relating to a plan, but only formal documents that establish or govern the plan." See Brown v. Am. Life Holdings, 190 F.3d 856, 861 (8th Cir. 1999) (agreeing with the definitions posited by the Fourth, Seventh, and Ninth Circuits as to documents "under which the plan is established or operated"). "This is not to say, of course, that companies have a permanent privilege against disclosing other documents. It means only that the affirmative obligation to disclose materials under [§ 1024(b)(4)], punishable by [statutory] penalties, extends only to a defined set of documents. **[\*49]** " Ames v. Am. Nat'l Can Co., 170 F.3d 751, 759 (7th Cir. 1999). Morley's contention that the by-laws "specify procedures and authority for the resolution of disability claims" is without merit. The by-laws contain no provisions describing or providing the procedure for the resolution of LTD benefit claims, or otherwise address how the Avaya LTD Plan is operated.

Morley has also failed to show bad faith or intentional conduct on the part of the Plan Administrator or prejudice as a result of not having the BCAC by-laws. Morley's requests for disclosures do not expressly include a request for the BCAC by-laws, and the other requests are not sufficiently specific to put the defendants on notice that she was seeking them. Thus, Morley has failed to show bad faith or intentional conduct on the part of the Plan Administrator in not turning over the by-laws. Concerning prejudice, Morley's allegation that she was denied access to potential materials prepared by BCAC's "legal advisor" or "medical advisor" is immaterial. Morley was appealing Gates's decision to deny her claim for LTD benefits to BCAC itself. At the time she submitted her request for disclosures, Morley had not **[\*50]** filed her appeal to BCAC from Gates's decision. Although Morley has attached a copy of her February 11, 2003 appeal letter with notations apparently scribed onto it by Hershkowitz, she has not shown that these notations occurred before Morley filed her appeal and her case came before BCAC. This rationale applies equally to any opinions of BCAC's medical advisor, who would not have been presented with making a decision as to her disability status until Morley submitted her appeal from Gates's determination to BCAC.

Morley's argument that she was prejudiced by later discovering that BCAC allegedly had no authority to resolve long-term disability claims is also without merit. During oral argument, Morley's counsel indicated that if he had this information, he would have dealt with Gates instead

of Avaya or BCAC. However, BCAC was the entity that handled Morley's appeal, so Morley filed her appeal with the correct entity. Morley also asserts that the by-laws would have provided her with "the opportunity to determine the LTD Plan's authority to hear additional, voluntary appeals." Morley has not identified any language in the by-laws that would have provided her with such an opportunity. **[*51]** For all of these reasons, Morley has failed to demonstrate that she was prejudiced by not having a copy of the BCAC by-laws.

2. Contract between Gates and Avaya

Morley also claims that the Plan Administrator failed to disclose a "Professional Services Contract" (the "Contract") between the Avaya LTD Plan and Gates. (Pl. Disclosure Br., at 18.) Morley asserts that she included a disclosure demand for the Contract within the "fifteen (15) itemized items including an omnibus request." (Id.) Morley contends that if she had the Contract, she would have:

> (1) "been on notice that the Avaya LTD Plan integrates issues relating to long-term and short-term disability and Workers' Compensation [and] crafted her appeal document such that her entitlement to short term disability benefits was discussed, analyzed, and emphasized[;]"

> (2) been able to challenge Gates's failure to secure a vocational assessment and its own independent medical examination;

> (3) argued that "cost factors drive the decisions of those who are otherwise fiduciaries [;]"

> (4) show that Gates relied upon the incorrect standard of disability in rejecting Morley's appeal; and

> (5) request information **[*52]** about an "action plan" regarding her workers' compensation case.

(Id. at 18-21.)

The defendants contend that, although Morley asserts that she was entitled to a copy of the "Claims Management Guidelines," she has failed to show that "any such Claims Management Guidelines for the application of the LTD plan existed." (Defs. Disclosure Opp. Br., at 10.) The defendants point out that Lori Kools and Gail Foley, two Gates employees, did not testify at their deposition that Gates uses any claims management guidelines generally or that any guidelines were used in processing Morley's claim. (Id. at 10-11.) The defendants assert that the Contract does not constitute a "claim management guideline" because it merely sets forth "Gates'[s] obligations to Avaya in the administration of long term disability benefits, including the type and timeliness of reporting; working with other providers in handling claims; logistics for training and human resources, etc." (Id. at 11.) The Contract also includes provisions regarding Gates's payments from Avaya. The defendants argue that the Contract does not include any "'guidelines' for how to handle LTD claims, but rather constitutes **[*53]** the agreement between the Plan and the Claims Administrator as to each party's respective duties and obligations." (Id. at 11-12.)

The Court finds that Morley did not specifically request a copy of the Contract or claims management guidelines in her disclosure request of December 20, 2002. None of the 15 requests include a request for the Contract or any claims management guidelines by explicit reference. Morley has generally contended that the Contract, at a minimum, would fall into the "omnibus request," or request # 15. Morley has not demonstrated that the Contract constitutes "any other documents which relate to any aspect of [her] entitlement to benefits, participation in the Plan, and/or the termination of her benefits[.]" Also, Morley has not shown that the Contract is a "claims

management guideline." The Contract does not include procedures or "guidelines" for handling LTD benefit claims.

Even assuming again that Morley included a request for the Contract (or claims management guidelines) in her disclosure request, it is not a plan document or a document "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Morley provides **[*54]** no case law to support her assertion that "claims management guidelines" are included in the group of required disclosures under Section 1024(b)(4). To the contrary, claims management guidelines have been determined not to fall within the scope of Section 1024(b)(4). See, e.g., Doe v. Travelers Ins. Co., 167 F.3d 53, 60 (1st Cir. 1999) (concluding that defendant's "mental health guidelines" that were part of basis for decision to deny benefits were not "one of the 'other instruments' [required to be produced under Section 1024(b) (4)]"); Tutolo v. Independence Blue Cross, 1999 U.S. Dist. LEXIS 6335, No. 98-CV-5928, 1999 WL 274975, at *2 (E.D. Pa. May 5, 1999) (determining that "documents detailing Defendant's appellate hearing procedures and describing the criteria Defendant used when deciding to deny approval for the ablation procedure . . . fall outside of what § 1024(b)(4) requires"). Further, the Contract itself does not constitute a legal document that (1) describes the terms of the plan or its financial status, or (2) otherwise restricts or governs the Plan's operation.

Morley has also failed to show bad faith or intentional conduct on the part of the administrator, or prejudice **[*55]** as a result of not having the Contract. Similar to her alleged request for the BCAC by-laws, Morley's disclosure requests do not expressly include a request for the Contract. Moreover, the other requests are not sufficiently specific to put the defendants on notice that she was seeking a copy of the Contract. Thus, Morley has failed to show bad faith or intentional conduct on the part of the administrator in not disclosing the Contract.

Morley's allegations of prejudice also are without merit. Morley alleges that, knowing that Gates handled workers' compensation and short-term disability claims, she would have "crafted" her appeal to focus more on Morley's eligibility and receipt of short-term disability benefits. However, as explicitly stated in the Plan documents and recognized by Morley in her appeal letter, the standards for eligibility for short-term disability and long-term disability benefits are not identical. Thus, Morley's eligibility and receipt of short-term disability benefits would not have been determinative to Gates's analysis of Morley's eligibility for LTD benefits. Morley has not identified how her short-term disability benefits eligibility or receipt of benefits **[*56]** would have altered her plan on appeal. In fact, the April 24, 2003 letter from BCAC denying Morley's appeal states that "[e]ligibility for LTD differs from that of STD. An employee must be unable to do any job for **any** employer to qualify for LTD, whereas for STD, the employee is totally disabled from performing the essential functions of his/her job at Avaya." (1-27-06 Vance Certif., at Ex. D (emphasis in original).)

Morley also asserts that she could have challenged the Plan's failure to secure a vocational assessment or independent medical examination. (Pl. Disclosure Br., at 19.) However, Morley cites to nothing in the plan documents that would have required Gates to seek a vocational assessment or independent medical examination during her disability assessment. Also, the Contract's language requiring Gates to perform a vocational assessment or independent medical examination as required by Avaya is not specifically included in the Contract under the section discussing's Gates's relationship with Avaya as to the LTD Plan.

The Court further finds that Morley has not shown that she was prejudiced by (1) not knowing Gates's financial arrangement with Avaya, (2) the allegedly **[*57]** different definitions of disability in the Contract and in the Avaya Plan, and (3) the "action plan" in workers' compensation. Morley's only assertion about the action plan is that, if she knew about it, she could have requested the information from the defendants. Because Morley's claim was denied, any potential offsets were not at issue at the time Morley filed her appeal to BCAC. Also, although Morley makes a conclusory allegation that Gates used the wrong standard of disability in denying her claim, there is no indication from the August 13, 2002 letter from Gail M. Foley, that Gates relied upon the wrong

standard. Furthermore, Morley does not allege how the payment relationship between Gates and Avaya would have altered the procedure or substance of her appeal, and she may argue such potential bias at trial.

## IV. LTD Benefits Offsets

The defendants contend that any potential award of LTD benefits should be offset -- under the terms of the Avaya LTD Plan -- by Morley's receipt of (1) social security disability benefits, (2) workers' compensation benefits, and (3) monies paid as part of an employment discrimination lawsuit. (Defs. Offset Br., at 1.)

The Avaya SPD provides **[*58]** that an employee's "eligible pay" consists of the employee's "basic pay rate as determined from the payroll records of the Company and [his or her] target incentive." (Avaya SPD, at 7; Pretrial Ord., at 7.) Morley's base salary was $ 73,800. (Pretrial Ord., at 7.) Morley's "target incentive" ("STIP"), was 10% at her management level as of 2002, or $ 7,380. (Id.) Thus, Morley's eligible pay for purposes of calculating LTD benefits is $ 81,180. (Id.)

The Avaya SPD provides that LTD benefits

> are paid in combination with other sources of disability income so that your total LTD income from all sources would equal 60% of your LTD **eligible total pay.**

> * * *

> ### Other Sources of Disability Income

> The LTD Plan is designed to work with other sources of disability income to provide your total disability income. The LTD Plan looks at all of your sources of disability income (except disability income from individual insurance you have purchased), and makes up the difference after benefits which you are eligible to receive from other sources are determined, such as:

> . Primary Social Security benefits (payable to you),

> . Workers' Compensation or any **[*59]** similar benefits,

> . Any state or federal disability benefits except veteran's benefits, and

> . Any Avaya Inc. pension benefits you may be eligible to receive at the time your LTD benefits begin.

(Avaya SPD, at 9 (emphasis in original).)

Before any potential offsets would be applied, 60% of Morley's base ($ 81,180) equals $ 48,708. (Pretrial Ord., at 7.) Thus, if Morley is entitled to LTD benefits, then the Avaya LTD Plan would offset other sources of disability income from $ 48,708 to determine the net benefits payable to her.

Morley applied for and received Social Security Disability ("SSD") benefits. (Morley Tr., at 154.) Morley received an initial retroactive SSD lump-sum award of $ 12,574.50 in or about January 2004. (Pretrial Ord., at 7.) Morley then received $ 1,014 per month in SSD benefits from January 2004 until August 2004. (Id.) Morley's SSD monthly benefit was reduced to $ 938 per month in August 2004. (Id.) Morley had received a total of $ 35,694.50 in SSD benefits as of December 2005. (Id. at 7-8.)

Morley also received temporary total disability workers' compensation benefits from Avaya, as administered by Gates, in the amount of $ 591 per week **[\*60]**  from February 15, 2002 to November 30, 2005, totaling $ 117,018. (Id. at 8.) **5** No determination has been made that the plaintiff is permanently physically impaired for the purposes of workers' compensation benefits. (Id.) In addition, Morley settled a disability discrimination lawsuit filed against Avaya for approximately $ 12,000. (Defs. Offset Br., at 6; Pl. Offset Br., at 5.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

**5** Morley still receives temporary workers' compensation benefits. (Pretrial Ord., at 8.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## A. SSD Benefits

The defendants argue that any potential award of LTD benefits should be offset by the monies Morley received as SSD benefits. Morley has conceded that the defendants are entitled to an offset against the full amount of her SSD benefits. (Pl. Offset Opp. Br., at 2.)

## B. Workers' Compensation

The defendants assert that any award of LTD benefits under the Avaya LTD Plan should be offset by the monies Morley received as temporary disability workers' compensation benefits. (Defs. Offset Br., at 10.) The defendants **[\*61]**  note that the Avaya SPD specifically provides for an offset of other sources of disability income, including, among other things, workers' compensation. (Id. at 10.) Morley, on the other hand, contends that not all of her workers' compensation benefits are in the form of disability income and, as such, the defendants are not entitled to a complete offset. The Court finds that the Avaya LTD Plan provides that all of Morley's temporary disability workers' compensation benefits would be offset against any potential award of LTD benefits.

An ERISA plan is interpreted in accordance with "the provisions of the [plan] . . . in light of all the circumstances." Firestone, 489 U.S. at 112; see In re Unisys Corp. Long-Term Disability Plan ERISA Litig., 97 F.3d 710, 715 (3d Cir. 1996) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract."). If the Court finds that the language of the plan is not ambiguous on its face, the provisions of the agreement should be enforced. In re Unisys, 97 F.3d at 715.

The Court finds that the Avaya SPD unambiguously provides that workers' compensation **[\*62]** benefits in the form of disability income are offset from any LTD benefit award. The temporary total disability benefits that Morley has been receiving are one of the three types of benefits that are available under the New Jersey Workers' Compensation Act ("NJWCA"). N.J.S.A. § 34:15-12. The temporary total disability benefits under the NJWCA are based on the claimant's wages. Id. An employee is entitled to 70% of the employee's weekly wages received at the time of the injury, subject to a maximum compensation of 75% of the average weekly wages earned by all employees covered by the NJWCA. Id. at § 34:15-12a. Temporary disability benefits are in lieu of weekly wages. Young v. W. Elec. Co., 96 N.J. 220, 475 A.2d 544, 547 (N.J. 1984). Thus, an employee that has not lost wages by reason of a temporary disability is not entitled to temporary disability payments under the NJWCA. Outland v. Monmouth-Ocean Educ. Serv. Comm'n, 154 N.J. 531, 713 A.2d 460, 464 (N.J. 1998). The parties do not dispute that Morley has received and continues to receive temporary total disability benefits under the NJWCA. Therefore, the Court finds that the monies Morley **[\*63]** has received and continues to receive as temporary total disability benefits - - which are in lieu of weekly wages -- constitute "workers' compensation" as disability income under the Avaya LTD Plan. **6**

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

6 No determination has been made to the extent of Morley's possible entitlement to permanent disability benefits under the NJWCA. Permanent disability benefits compensate for the employee's physical impairment to carry on the ordinary pursuits of life in addition to loss of income. Olivero v. N.J. Mfrs. Ins. Co., 227 N.J. Super. 367, 547 A.2d 710, 717 (N.J. App. Div. 1988). It is premature to consider whether any monies paid for permanent disability benefits under the NJWCA should be offset against a potential award of LTD benefits because Morley has not been determined eligible to receive such benefits.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## C. Settlement Proceeds

The defendants claim that they are entitled to an offset for some monies Morley received as part of a settlement of her New Jersey Law Against Discrimination ("NJLAD") claim against Avaya, **[*64]** Inc. in New Jersey state court. (Defs. Offset Br., at 14.) The defendants point out that the terms of the settlement agreement "require [Morley] to dismiss her state court action in exchange for: (a) payment in the amount of $ 12,487.22 less standard deductions and withholdings required by law 'for alleged lost wages . . .'; (b) payment of $ 12,487.72 for 'alleged emotional distress/pain and suffering . . .'; [and] (c) payment in the amount of $ 12,524.56 for attorneys' fees and costs." (Id. at 15.) The defendants argue that the amount Morley received for lost wages should be offset by the amount of any LTD benefit award because she would "effectively receive a double recovery." (Id. at 16.)

Morley argues that the Avaya LTD Plan contains no language allowing the offset against a state court settlement. (Pl. Offset Opp. Br., at 5.) Plaintiff also asserts that the defendants have cited to no specific language in the plan permitting them to offset the proceeds of Morley's settlement. (Id.) The Court finds that any amount of the settlement proceeds that Morley received for "lost wages" does not offset against any potential award of LTD benefits.

The defendants concede **[*65]** that the Avaya SPD does not include in its offset provision the receipt of income as a result of litigation. (Defs. Offset Reply Br., at 9.) The language in the Avaya SPD providing for an offset of "other sources of disability income" does not expressly include monies received through litigation settlements. There was nothing in the Avaya LTD Plan or other plan documents that would have notified Morley that settlement proceeds could offset any potential LTD benefit award.

## V. Breach of Fiduciary Duty Claim

The defendants argue that Morley cannot maintain her breach of fiduciary duty claim in Count II of the complaint because she is only seeking relief that is "duplicative of her demand for damages for the alleged wrongful denial of benefits." (Def. Fiduciary Br., at 3.) The defendants also contend that (1) the Avaya LTD Plan cannot be liable for breach of fiduciary duty because it is not a "fiduciary" under ERISA, and (2) if judgment is entered for the defendants on Morley's breach of fiduciary duty claim, the Court should dismiss her other claims against Gates and BCAC for wrongful denial of benefits or disclosure penalties. (Id. at 11.)

### A. Potential Liability of [*66] the Avaya LTD Plan

The defendants contend that the Avaya LTD Plan cannot be liable for breach of fiduciary duty because it is not a "fiduciary" under ERISA. (Def. Fiduciary Br., at 9.) Morley has withdrawn her request for relief for alleged fiduciary breaches against the Avaya LTD Plan.

### B. Viability of Morley's Breach of Fiduciary Claim Against the Remaining Defendants

The defendants argue that Morley cannot maintain her breach of fiduciary duty claim in Count II of the complaint because she is only seeking relief that is "duplicative of her demand for damages for